INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS
and
District 147 of the International Association of Machinists and Aerospace
Workers, Plaintiffs,

v.

NORTHEAST AIRLINES, INC.,
Defendant.

Civ. A. No. 73–303.

United States District Court,
D. Massachusetts.

Feb. 3, 1972.

Robert M. Segal, Segal, Roitman &
Coleman, Boston, Mass., for plaintiff.

Loyd Starrett, Foley, Hoag & Eliot,
Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

CAMPBELL, District Judge.

This case was heard on January 27,
1972 on an application for a temporary
restraining order and a preliminary injunction. The issues were submitted on
plaintiffs' verified complaint, affidavits
from all parties, and briefs.

After consideration, and for reasons
set forth below, the Court concludes that
it must deny injunctive relief to the
plaintiffs.

I

The plaintiffs, International Association of Machinists and Aerospace Workers (IAM) and District 147 of IAM, request a preliminary injunction (1) restraining the defendant, Northeast Airlines, Inc. (Northeast) from consummating any merger with Delta Air Lines,
Inc. (Delta), until Northeast has negotiated with and bargained in good faith
with them about the "proper provisions
for the protection of employees' seniority, employment and other rights", and
(2) directing Northeast to negotiate
with and bargain in good faith with
them about the protection of employees'
seniority, employment and other rights.

The relief ultimately sought by the plaintiffs in this action, in addition to the above injunctions, is "a judgment directing the defendant, Northeast Airlines, Inc., to incorporate the results of the negotiations and good faith bargaining with the plaintiffs in any final merger agreement with Delta Air Lines, Inc." (Prayer (4))

## II

The plaintiffs cite the following Article III(B) of two collective bargaining agreements with Northeast, one dated April 18, 1969, covering employees in the mechanics' craft, and the other dated November 6, 1969,[1] covering supervisory employees:

> "It is further understood and agreed that all provisions of this Agreement shall be binding upon the successors or assigns of the Company [Northeast] for the duration of this Agreement. In case of a consolidation or merger, representatives of the Company and Union will meet without delay and negotiate for proper provisions for the protection of employees' seniority and other rights."

The plaintiffs also rely upon the provisions of 45 U.S.C. Sec. 152 First, reading as follows:

> " . . . It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

## III

For purposes of the matter now before me, the most relevant facts appear to be as follows:

On May 12, 1971, Northeast and Delta, pursuant to resolutions of their boards of directors, entered into a formal merger agreement, a copy of which is before the Court. Northeast's decision to merge was an outgrowth of what it represents to be its desperate financial plight (detailed in an exhibit to the Peterson affidavit). Northeast on May 31, 1971 had a negative net worth of $36,616,000. It is undisputed that Northeast, a small, mainly regional carrier, is, and has for some years been, in acute financial distress. There is nothing before me to contradict Northeast's assertions that the merger is essential to its survival.

The merger agreement provides that the two corporations shall be combined by merging Northeast into Delta. After the merger, the surviving corporation, Delta, is to be governed by a board of directors consisting of Delta's board on the date of the merger plus two named individuals. The shareholders of Northeast will receive fractional shares of Delta's stock. Delta is larger than Northeast. Northeast will, in effect, be absorbed into Delta. Northeast's employees represented by IAM number about 1,000. Delta has 20,786 employees, none of whom, with the exception of the pilots, are members of a union.

The merger agreement provides that the merger will become effective upon filing and recording of the agreement in Delaware. This is to occur as soon as practicable after approval of the merger by the stockholders of the two corporations and by the C.A.B. under sections 408 and 801 of the Federal Aviation Act of 1958.* (A meeting of the stockholders of Northeast was scheduled for Jan-

---

1. Northeast's collective bargaining agreement with the mechanics expired December 31, 1971, but its terms continue in effect under provisions of the Railway Labor Act (45 U.S.C. Sec. 156). That with the supervisory employees continues by its terms until at least June 1, 1972.

* 49 U.S.C. Secs. 1378, 1461.

uary 31, 1972, at which time the question of approval of the merger agreement was scheduled to be acted upon.) The agreement terminates if the merger is not approved by the C.A.B., by the latest, June 30, 1972. (See par. 15, (a) (3).)

The merger agreement contains provisions *imposing liability upon Delta,* after the merger, for all of Northeast's obligations, liabilities and duties, and *transferring to Delta all of Northeast's rights and property.*

The agreement also contains a clause entitled "Labor Protective Conditions". This provides that the surviving corporation will accept "reasonable labor protective provisions of the character and extent previously prescribed by the Civil Aeronautics Board". The Civil Aeronautics Board's trial examiner has written extensive labor protective provisions (Peterson affidavit, exhibit 7), which, according to the defendant (memorandum, p. 11), will be incorporated into any final Civil Aeronautics Board order approving merger. The merger agreement further provides that after the date of the merger, *Delta will retain as its employees such employees of Northeast as is consistent with economic and efficient performance of the expanded operations of Delta, and will endeavor to provide* continuing employment for them with Delta. Group insurance and retirement benefits for former Northeast employees are to be determined pursuant to existing Northeast plans.

It was asserted by counsel for Northeast, and not disputed, that the proposed merger was common knowledge prior to the execution of the May 12, 1971 agreement, and that the making of the agreement itself was also commonly known immediately thereafter.

It is asserted by Northeast (Peterson affidavit) that in 1945, 1950, 1960 and 1964, mergers of Northeast with other airlines were negotiated or agreed to, although never consummated. In November 1969, Northeast entered into a merger agreement with Northwest Airlines, Inc. That agreement, although approved by the C.A.B., was terminated by Northwest early in 1971. Mr. Peterson asserts in his affidavit that the plaintiffs never demanded negotiations in connection with any of the above proposed mergers, even though Article III(B) has been in every contract with them since April 1, 1949.

On October 28, 1971, the company sent the union a so-called "Sec. 6 Notice" (notice pursuant to Section 6, Title I of the Railway Labor Act, as amended; 45 U.S.C. Sec. 156) stating its intention to propose a change in the existing mechanics agreement, which would extend the agreement "for a period of a few months". (Exhibit 2A of the verified complaint.) On October 31, 1971, the union, pursuant to Sec. 6, notified the company of its proposed changes. (Exhibit 2B of the verified complaint.) In neither letter was there mention of the Northeast-Delta merger; however, among the union's proposed changes in the agreement was an expansion of Article III(B) to set forth procedures for negotiations before any merger should occur. (Orlando affidavit, exhibit 2C.)

Negotiations on a new contract opened on November 11, 1971, at which time the union representative, William J. Sutherland, asked for immediate negotiations, pursuant to Article III(B) of the existing agreement, for post-merger protective provisions for Northeast employees. (Complaint, exhibit 4.) The Northeast representative, Herbert E. Orlando, replied that he was uncertain whether or not his company was "prepared to negotiate" and would consult with Northeast's officers. (Orlando affidavit, p. 3.) According to Sutherland, Northeast on November 22, 1971 again refused to answer his request for negotiations, saying Delta would be consulted. Northeast maintains that in all encounters subsequent to the November 11 meeting, it has told the union that, though not obligated under Article III(B) to negotiate prior to merger, "it would be willing to discuss all such issues". (Orlando affidavit, p. 3.) On December 17, 1971, responding to Sutherland's letter of De-

cember 2 demanding negotiations (Complaint, exhibit 4.), Orlando stated: ". . . we are prepared in the future, as we have on several days in the past, to discuss fully the issues referred to in your letter as well as other matters about which we are bargaining." (Sutherland affidavit, exhibit 2.) Presumably such issues were those arising under Article III(B). However, the company has always maintained that it was not obligated to bargain over any terms of employment under Delta, and Orlando says that he has "stated candidly that [he does] not see how an agreement on post-merger conditions can be reached prior to the approval and consummation of the merger". (Orlando affidavit, p. 3.) According to Sutherland, on the other hand, the company consistently refused to negotiate protective provisions up to and including the last meeting of the parties on December 21, 1971. (Sutherland affidavit, p. 3.) At that meeting the union broke off further negotiations over proposed changes in the collective bargaining contract. (Orlando affidavit, p. 4.)

On December 28, 1971, Northeast filed an application before the National Mediation Board, requesting mediation of the dispute over pre-merger negotiations (as well as mediation of the dispute over the union's proposed changes in the contract). (Orlando affidavit, exhibit 6.) The union, having sought the services neither of the Mediation Board nor of the System Board of Adjustment, filed this action here on January 24, 1972.

IV

Turning from the facts to the substantive issues, I believe that, in the final analysis, my decision must rest upon a balancing of the plaintiffs' interest in protecting its members by bargaining to the fullest extent, against the right of Northeast's management to decide the future of that financially ailing airline.

If the union receives the injunctive relief requested, the merger (which was agreed to between Delta and Northeast in a binding contract six months before the union adopted its present posture) will be postponed and may even be aborted. If, on the other hand, no relief is granted, the merger may shortly occur —not, as hereafter indicated, with necessarily worse consequences to the employees, but at least without their having been able to attempt to influence the express terms of the merger agreement itself.

At this moment in time, under the particular facts and circumstances, I conclude that Northeast's right to proceed, unhampered, with the merger should prevail. I reach this result without in any way belittling the union's concern over the consequences to its members of the merger. The merger and its consequence are of obvious importance and seriousness to the employees of Northeast.

In stating that the primary issue involves a determination of competing interests, I do not suggest that there are not other issues. Some, such as the late timing of the union's demands and the lack of a clear showing by the union of irreparable harm, are intimately related to the weighing of competing equities. Others, such as the question of exhaustion of remedies under the bargaining contracts and under the Railway Labor Act, raise independent issues which might constitute alternative grounds for decision but which I do not believe need be reached.

V

It is crucial to have in mind the precise injunctive relief sought and the ultimate object, asserted in the complaint, of this litigation.

The plaintiffs argue that their aim is merely to cause Northeast to engage in good faith bargaining over post-merger seniority and employment—that their request is merely, as it were, to reopen lines of communication with Northeast. By themselves, these are reasonable

enough demands.[2] However, the relief sought to accomplish these results is rather less innocuous.

The plaintiffs seek an injunction enjoining "Northeast from consummating any merger" with Delta (pursuant to its outstanding contract) until it has bargained and negotiated with the plaintiffs in good faith about the proper provisions for protection of employees' seniority, employment and other rights. Further, the complaint makes clear that the aim of the bargaining is not the usual one of a new collective bargaining agreement between the union and Northeast. Rather the Court is ultimately to "issue a judgment directing . . . Northeast . . . to incorporate the results of the . . . bargaining in any final merger agreement with Delta". This judgment is to issue although Delta is not a party to this proceeding.

Since Delta cannot be required to agree to a change in the terms of the present contract, and since Delta, the larger and stronger of the two airlines, might well be expected to decline such a change in terms, the ultimate relief requested might have the effect of aborting the merger. Indeed, even an injunction postponing the merger indefinitely could have that effect, since Delta is not required to waive timely performance by Northeast.

Thus the plaintiffs seek far more than an order reopening channels of negotiation. To secure what they assert to be their bargaining rights, they demand that the Court subordinate Northeast's rights under the merger agreement and imperil the merger itself.

## VI

The plaintiffs rest their claims for relief upon 45 U.S.C. § 152 First and upon Article III(B) of the collective bargaining contracts. (Both the statute and contract provision are quoted above.)

Section 152 First requires carriers to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes." This language requires carriers to bargain and negotiate in good faith. Nonetheless, the duty to exert every reasonable effort to make and maintain agreements does not, I believe, go so far as to require a carrier to postpone, renegotiate and jeopardize its rights under a pre-existing merger agreement upon the insistence of its employees.

The decision to merge, like the decision of an enterprise to invest in labor-saving machinery or to liquidate, is a managerial decision. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 223, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (concurring opinion of Justice Stewart, with Justices Harlan and Douglas).

The Court said in John Wiley & Sons v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964):

> "Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. . . ."

Management's position is strengthened in this case by the fact that the plain-

2. It is to be noted that the union, not Northeast, broke off negotiations in late December. The union thereafter rejected the company's request for mediation by the National Mediation Board and has refused to invoke the so-called "minor dispute" procedures in the bargaining contracts and in the Railway Labor Act.

Northeast asserted in Mr. Orlando's letter of December, 1971 that it was fully prepared to discuss all the issues. However, Orlando also told the union that he did not see how an agreement on post-merger conditions could be reached prior to approval and consummation of the merger.

tiffs waited for six months after execution of the present merger agreement to demand negotiations. While the seniority, employment and other rights which they wish to bargain for are their legitimate concerns, the relief they now seek would have an impact far beyond the specific matters they wish to negotiate. Delta is, of course, under no obligation to postpone the merger or to accept a new merger agreement or to abandon its rights under the old one. If relief is granted, the management of Northeast would be deprived of a substantial measure of control over the decision to merge itself.

This is not to say that the plaintiffs may not bargain for a new collective bargaining contract which may have provisions relating to seniority and other matters surviving the merger. Under Article III(B), the existing collective bargaining contract is declared to be binding upon Northeast's successors and assigns. It, or a successor agreement, may well be enforceable after the merger. John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Arbitrators have often held that, where the acquiring company is on notice of a successors and assigns clause, it is bound by the terms of the contract. *See*, e. g., Wheeler Bros., 41 Lab.Arb. 844, 850 (1963), Lake States Leasing Corp., 46 Lab.Arb. 935 (1966), Sanborn's Motor Express, Inc., 44 Lab.Arb. 346 (1965).

It is true that the court in Burns Int. Detective Agency v. NLRB, 441 F.2d 911 (2nd Cir. 1971), held that a successor is not bound by all the terms of the pre-existing contract. But it appears that the contract may not have included a successors and assigns clause. The opposite result was, in any event, reached in Ranch-Way, Inc. v. NLRB, 445 F.2d 625 (10th Cir.1971). The Burns case is now before the Supreme Court.

Moreover, Northeast represents that the C.A.B., which must approve the merger, will, in its decision, afford employees protective provisions such as those set forth extensively in a report of the C.A.B. hearing examiner. (Defendant's Memorandum, p. 11; Peterson affidavit) *See* 49 U.S.C. § 1378(b). The C.A.B., as part of its statutory authority to regulate the merger of air carriers, has extensive power to order the integration of employees. The C.A.B.'s rulings as to the placing of employees on seniority lists may even supersede the provisions of a collective bargaining agreement. Kent v. Civil Aeronautics Bd., 204 F.2d 263 (2nd Cir.1953), cert. denied 346 U.S. 826, 74 S.Ct. 46, 98 L. Ed. 351 (thus making it questionable whether and to what extent arrangements made at this time between Northeast and the plaintiffs would be useful or feasible).

In any event, I do not construe Northeast's reluctance, at this late hour, to place on the bargaining table items which would involve a renegotiation of the previously executed merger agreement with Delta as unreasonable or as in violation of the provisions of Section 152 First.

## VII

The plaintiffs further rely upon Article III(B) of the two collective bargaining contracts now in effect.

The first sentence of the clause provides that the collective bargaining contract shall be binding upon the successors and assigns of Northeast. The second sentence states:

"In case of a consolidation or merger, representatives of the company and union will meet without delay and negotiate for proper provisions for the protection of employees' seniority and other rights."

It is not clear (especially in context of the preceding sentence) whether this second sentence calls for negotiations *after* a merger or before. Furthermore, there is nothing in the sentence or in the collective bargaining contracts themselves which binds the company not to merge on its own, rather than the union's, timetable. The contracts nowhere expressly condition a merger upon the

holding of prior bargaining sessions. (The absence of such language may be contrasted with specific provisions in Article III(C) prohibiting strikes and lock-outs pending the attempts to settle disputes through established procedures).

If one assumes, notwithstanding the dispute and grievance procedures in the contract and in the Railway Labor Act, that this Court now has the authority to interpret this sentence, I would conclude that the language does not go so far as to give to the union a mandatory voice in the negotiating of the merger. If the contract was intended to condition the right to merge upon satisfactory advance bargaining concerning the terms of the merger, one would expect it to have said so.

The failure of the union to request pre-merger negotiations in five previous instances of contemplated mergers, and the fact that it did not raise the present issue until six months after the Delta merger agreement was executed, is consistent with the foregoing interpretation.

One can argue, of course, that while the right to merge is not conditioned upon advance bargaining, the practical circumstances of this case justify an injunction as the only means of enforcing the union's contractual right to negotiate with the company concerning proper provisions for the protection of employees' rights. But given the accepted notion that merger is a management decision, the ambiguity of the clause, the serious potential impact of an injunction upon Northeast and its future existence, and the other equities and circumstances, I am unable to reach that result.

Northeast, of course, contends that the interpretation of this clause, like the other contract provisions, is a matter for the System Board of Adjustment, as a so-called minor dispute. The union has not placed the matter before the Board, nor is it willing to accept mediation by the National Mediation Board. One may question whether the union, as a precondition to the injunctive relief sought, has made "every reasonable effort" to settle this dispute, using the procedures of the Railway Labor Act and the contracts. 29 U.S.C. § 108.

The union contends that the dispute is not a minor one, and relies upon Chicago & Northwestern Ry. Co. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). (In that case, the Court specifically noted that the parties had exhausted the formal procedures of the Railway Labor Act.)

Even assuming, without deciding, that the union is right, I do not interpret Article III(B), any more than I do 45 U.S. C. § 152, as conferring upon the union, under the present circumstances, the right to the relief sought in this suit: namely, to enjoin the consummation of the Delta merger pending negotiations between Northeast and itself and a final "judgment directing the defendant, Northeast Airlines, Inc., to incorporate the results of the negotiations and good faith bargaining with the plaintiffs in any final merger agreement with Delta Air Lines, Inc." (Prayer (4))

## VIII

Since even on the legal posture most favorable to the plaintiffs, I do not believe that the plaintiffs have a reasonable probability of success, I am of the opinion that a preliminary injunction may not issue.

I further conclude that the plaintiffs have failed to demonstrate that they and the employees they represent will suffer irreparable harm if the requested injunctive relief is denied. Even if Delta will not be bound by the existing or later negotiated collective bargaining agreements, and even if the C.A.B. does not afford the employees adequate protection, it is by no means clear that bargaining with Northeast at this time can accomplish important lasting results. There is little assurance that Delta would accept more favorable labor provisions than it would later accept, or that

Northeast would be in a position to require Delta to accept them. Northeast is the weaker of the two companies, and would seem to be in a poor position to force a renegotiation of the merger agreement. What could occur—to the ultimate likely detriment of all concerned, including the public—is the collapse of the merger and the possible eventual collapse of Northeast. As against the highly speculative gain to the employees of an injunction, one must weigh the more positive danger to Northeast's future existence should the merger be aborted.

Preliminary injunction denied.