**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS and District 147 of the International Association of Machinists and Aerospace Workers, Plaintiffs-Appellants,**

v.

**NORTHEAST AIRLINES, INC.,**
**Defendant-Appellee.**

No. 72–1038.

United States Court of Appeals, First Circuit.

Heard March 8, 1972.

Decided April 20, 1972.

Robert M. Segal, Boston, Mass., and Plato Papps, Washington, D. C., with whom Segal, Roitman & Coleman, Boston, Mass., was on brief, for plaintiffs-appellants.

Loyd M. Starrett, Boston, Mass., with whom Henry E. Foley, David B. Ellis, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for defendant-appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

On May 12, 1971, Northeast Airlines, Inc., (NE) entered into a provisional agreement to merge into Delta Air Lines, Inc. (Delta). This was the fifth attempt by NE to merge with another line. Whatever may have motivated the others, all of which failed for one reason or another, NE's substantial and continuing deficits seem clearly to have impelled this one. Indeed, it asserts without contradiction that this is its last chance for survival.[1] The agreement has not yet become final. Either party may terminate unless both CAB and stockholder approval is secured prior to the designated consummation date of June 30, 1972. Permission was sought of the CAB by filing on May 12, 1971. Following pretrial procedures, a trial examiner conducted hearings in July, and on October 26 rendered a report to the Board recommending approval. The Board, as yet, has made no decision. The NE stockholders voted to approve on January 31, 1972. It does not appear from the record whether the Delta shareholders have yet done so.

NE has collective bargaining agreements, one with its mechanics, which expired December 31, 1971 subject to being continued in force by virtue of section 6 of the Railway Labor Act, 45 U.S.C. § 156, and one with its supervisors, which will expire on June 1, 1972. In both instances the union involved is the International Ass'n of Machinists and Aerospace Workers and its District 147, plaintiffs appellants, hereinafter, collectively, the Union. Both of these agreements and their predecessors going back to 1949, have contained what is now Article 3(B), as follows.

"It is further understood and agreed that all provisions of this Agreement shall be binding upon the successors or assigns of the Company for the duration of this Agreement. In case of a consolidation or merger, representatives of the Company and Union will meet without delay and negotiate for proper provisions for the protection of employee's seniority and other rights."

1. To document its plight, NE presented testimony that it had suffered losses in 1969 of $28,843,000, and in 1970 of $10,721,000, and that as of May 31, 1971, it had a negative net worth of $36,616,000. NE further avers that it anticipates continuing substantial losses in 1971 and 1972, and that Storer Broadcasting Company, which has been its major source of financial support, has resolved to provide no further cash advances beyond what is necessary to prosecute the NE–Delta merger.

No question has hitherto arisen under this clause, although one previous merger progressed even further than the present one before it aborted.

Since the agreement provided for automatic renewal and no change in the contract terms could be made without notice served on or before October 31, 1971, NE on October 28 sent the Union an appropriate section 6 notice of intended termination of the Mechanics' agreement, proposing that the agreement be extended only for "a few months." On October 31 the Union sent its own notice, saying that it wanted the agreement to run a full term, and enclosing a list of further proposals. The enclosure, some six pages long, requested, inter alia, changes in Article 3(B), to provide procedures for premerger negotiations. On November 11, the first meeting resulting from this correspondence, the Union announced that its first request was not for the contract changes it had proposed, but for negotiations for specific postmerger protective provisions, relating to seniority, employment, and other conditions. The company asked time to consider this request. After several further meetings, at which the position of the parties might be said to have hardened, on December 31, the Union stated that this subject was all it would negotiate, and the company said it was willing to "discuss," and go to the National Mediation Board or System Board of Adjustment, but that the matter was one which it had no obligation to negotiate.[2] On the basis that the company offered only discussion, with no recognition of a duty to bargain, the Union left the meeting, and on January 24 brought the present suit. Jurisdiction derives from the Railway Labor Act, 45 U.S.C. § 151 et seq.

The Union seeks to compel the company to negotiate, and to include in the merger agreement whatever should be the product of the negotiations. It requested a preliminary injunction, in alternative terms.[3]

"(a) Consummating any merger with the Delta Air Lines, Inc. until the Company has negotiated and bargained in good faith with the Plaintiffs about the proper provisions for the seniority, employment and other rights of the employees of Northeast Air Lines Inc. [sic] represented by Plaintiffs."

"(b) In any manner refusing to negotiate or bargain in good faith with the Plaintiffs about the seniority, employment and other rights of the employees represented by the Plaintiffs."

This question was heard on the pleadings and affidavits by the district court which, on February 3, with a comprehensive opinion, denied relief. D.C., 337 F.Supp. 499. The union appealed, unsuccessfully sought interim relief, and now argues the merits of its appeal.

The district court rested its decision upon a finding that the right of NE's management to decide the company's future outweighed whatever interest plaintiff had in protecting its members. It left unclear to what extent it was relying on particular facts to justify a finding that it would be inequitable to grant the injunction, and to what extent on a broader conclusion that because of the general interests of management and labor the statutory duty did not require bargaining. While we agree that it is appropriate, especially when both parties face irreparable injury, to weigh the competing interests, we find it useful to speak in terms of the traditional tests of

2. Since the Mediation Board does not have exclusive jurisdiction to define the subjects about which an employer has a statutory duty to bargain, see Pan American World Airways v. International Bhd. of Teamsters, S.D.N.Y., 1967, 275 F. Supp. 986, aff'd, 2 Cir. 1969, 404 F.2d 938, we do not see how the company's sug-

gestion to seek its services is pertinent to the case before us, except as revealing a willingness to bargain about the other issues initially raised by the union, not presently relevant.

3. In point of fact, as will be evident, there is little to choose between the two, so far as consequences are concerned.

irreparable injury and probability of success on the merits. *See* Automatic Radio Mfg. Co. v. Ford Motor Co., 1 Cir., 1968, 390 F.2d 113, 115–116, cert. denied 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653. In reviewing the district court's opinion, therefore, we shall first examine what we interpret as its finding that the balance of hardship favors denying relief, deferring for the moment the question of whether such relief must be granted nevertheless because an overwhelming case in plaintiff's favor is present on the merits and the equities of the case. *See* Dorfmann v. Boozer, 1969, 134 U.S.App.D.C. 272, 414 F.2d 1168, 1173.

The district court regarded with seriousness, as do we, the possible plight of the Union's membership if their employer is taken over and merged into another whose employees outnumber them twenty to one, which might well discontinue certain NE services, either absolutely, or as duplicative, and which does not, according to the Union, promise certain seniority and other rights that would accrue to its members had NE continued its operations. However, a court of equity must be concerned not only with possible injury to the plaintiff but also with whether an injunction would cause irreparable harm to the defendant, for it is obliged to choose the course likely to cause the least injury. *See* Eutectic Welding Alloys Corp. v. Zeisel, D.N.J., 1950, 11 F.R.D. 78, noted in Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1056–59 (1965). It would be unrealistic not to view the possible ramifications of an injunction, the most obvious of which is the possible collapse of the merger, and the consequence, which on the record seem inevitable, of the demise of the company.[4] As against this, the consequences to the employees of the merger's accomplishment in accordance with the present plan do not appear drastic. Extensive labor protective provisions are contained in the order proposed by the CAB examiner. Delta further assumes NE's obligations, which on their face include the obligation imposed by Article 3(B), ante. We cannot at this time measure the cloud that may be cast upon this obligation by the case of William J. Burns Int'l Detective Agency, Inc. v. NLRB, 2 Cir., 1971, 441 F.2d 911, cert. granted 404 U.S. 822, 92 S.Ct. 99, 30 L. Ed.2d 49, except to say that presently a cloud is all it is.[5] In any event, the employees will fare far better if the merger goes through without the desired nego-

---

4. The parties did not develop with us what benefits the employees would receive from a defunct and bankrupt company.

5. In *Burns*, there may have been no clause in the collective bargaining agreement making it binding on successors and assigns. Several recent arbitration cases have held that where there is such a clause and the successor has notice of it, he is bound by the contract. *See, e. g.,* Wheeler Bros., 1963, 41 Lab.Arb. 844, 850; Lake States Leasing Corp., 1966, 46 Lab.Arb. 935. See generally Shaw & Carter, Sales, Mergers & Union Contract Relations, 19 N.Y.U. 19th Annual Conf. on Labor 357, 373 (1967). In any event, the successor in *Burns* did not purchase his predecessor's company, but simply won a particular contract away from him and retained most of his employees to perform it. That is significantly different from a merger in which the law is generally that the surviving company is bound by the contracts of the one which disappears. *See* 15 Fletcher, Private Corporations (1961 rev. ed.) § 7121. In the present case Delta in the merger agreement expressly assumes the duties of NE.

Even if Delta is not bound by all the terms of the union contract, it may well be obligated by Article 3(B) to bargain with the union about the effects of the merger. The employees' rights under Article 3(B) could be said to vest at the time of the merger and to impose a duty on the employer which must be discharged even after the collective bargaining agreement expires. Under the rule of John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898, such an obligation may bind a successor, at least to some extent. *But cf.* NLRB v. McFarland, 10 Cir., 1962, 306 F.2d 219.

**554**

tiations than will the company, not to mention the employees themselves,[6] if it does not go through at all.

With these preliminaries we turn to consider the likelihood that an injunction would interfere with the merger. We note first that the Union's conduct has itself enhanced the danger. Its demand to negotiate did not take place until November 11, although the merger agreement was executed in May, and was known to be in the making for some time before then. In July the agreement had been presented to the Board examiner; the Union, we understood in oral argument, had presented its own views, and the examiner had filed a report recommending certain provisions for the protection of the merged employees. For the Union now to seek to negotiate is not only late in the game, but would, if productive from Union's standpoint to the extent of requiring changes in the terms of the merger agreement, require going back to the Board. The merger cannot go through unless the Board decides that its terms, including the provisions for the employees, are in the public interest. 49 U.S.C. § 1378. *See* Kent v. CAB, 2 Cir., 1953, 204 F.2d 263, cert. denied 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351. The likelihood of this producing difficulties is only too apparent. Since the United-Capitol Merger Case, 1961, 33 C.A.B. 306, 342–47, the Board has uniformly applied the same labor protective provisions in every merger and route transfer case. *See* American Airlines v. CAB, 2 Cir., 1971, 445 F.2d 891, cert. denied 404 U.S. 1015, 92 S.Ct. 681, 30 L.Ed.2d 663. These provisions are what the examiner has recommended in the present case, and are what the International Union candidly concedes it is seeking to attack as a matter of policy. Hence the Union's success at the bargaining table would presage probable opposition at the

Board level, as well as possible rejection of the merger by Delta either because of the unwillingness of its shareholders to approve the merger on such more restrictive terms, or on the grounds that the terms exceeded "reasonable labor protective provisions of the character and extent previously prescribed" by the Board. Article 5 of Agreement of Merger. Even if both Delta and the CAB approved the changes, the delay would itself be likely to destroy the merger, since the merger agreement expires June 30.

■ Since, as the district court properly found, an injunction, even to require NE to negotiate, let alone to postpone the merger, threatens damages to NE all out of proportion to those faced by the Union, we must place upon the Union the burden of showing a compelling probability of success on the merits.

■ The first of the Union's contentions is that Article 3(B) is itself an agreement to conduct premerger negotiations. Insofar as the court's denial of the injunction was based upon a rejection of that interpretation, we believe the court exceeded its jurisdiction. The Railway Labor Act provides specific procedures for the settlement of disputes. Disputes concerning matters about which the parties have a statutory duty to bargain under 45 U.S.C. § 152 First are denominated major disputes and are left to the statutory collective bargaining procedures for settlement. Disputes requiring the interpretation of the terms of a collective bargaining agreement are minor disputes. *See* Elgin, J. & E. Ry. v. Burley, 1945, 325 U.S. 711, 722–728, 65 S.Ct. 1282, 89 L.Ed. 1886. The Act provides that such disputes may be submitted by either party for settlement by a System Board of Adjustment and that the award of the Board is not subject to judicial review. 45 U.S.C. § 184. Because this section vests exclu-

---

6. We do not believe, or even suspect, that the Union wants the merger to fail. Rather, our suspicion is that realizing how strongly other persons desire the merger, the Union feels it may have the leverage to obtain something additional for itself. We do not say that this is wrong. On the other hand, the Union is not possessed with fireside equities.

sive jurisdiction in the System Boards of Adjustment, the courts do not have jurisdiction to interpret the terms of a collective bargaining agreement. Ruby v. Pan American World Airways, S.D. N.Y., 1965, 252 F.Supp. 873, 880, appeal dismissed, 2 Cir., 1966, 360 F.2d 691; Transport Workers Union v. American Airlines, 10 Cir., 1969, 413 F.2d 746.

The courts have no greater power to interpret a contract when the dispute is between a union and an employer than when it is between an individual employee and the company. *See* Slocum v. Delaware, L. & W. R. R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795. Nor does it make a difference that here the clause in question arguably imposed a duty to bargain. While courts traditionally define the scope of the statutory duty to bargain, the statute provides no rationale for holding that the Board's authority to interpret a clause committing additional items to bargaining or regulating the procedures for bargaining is less than its general authority. The cases cited by the Union for the proposition that it is for the courts to decide to what settlement procedure the contract commits disputes, *e. g.*, Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; Steelworkers Trilogy, 1960, 363 U. S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, were not decided in the context of the Railway Labor Act's express delegation of questions of contract interpretation to the System Boards and are therefore inapposite. The court's error was not inconsequential, for regardless of what interpretation the court would give to a contract clause, it may not on that ground refuse to enjoin a proposed change in working conditions until the Board has had an opportunity to rule whether the change is permitted by the contract.[7] *Cf.* Rutland Ry. v. Brotherhood of Locomotive Eng'rs, 2 Cir., 1962, 307 F.2d 21, cert. denied 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978.

■ Nevertheless, we affirm the district court's holding that an injunction should not issue on the basis of Article 3(B). The Union has not placed the matter before the System Adjustment Board. Since the purpose of an injunction is to preserve the jurisdiction of the Board, this is an inappropriate case to grant such relief.[8] Westchester Lodge 2186 v. REA, ante n. 7, 329 F.2d at 753; Hilbert v. Pennsylvania R. R., 7 Cir., 1961, 290 F.2d 881, cert. denied 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96; *cf.* Manion v. Kansas City Terminal Ry., 1957, 353 U.S. 927, 77 S.Ct. 706, 1 L. Ed.2d 722. *See also* 29 U.S.C. § 108.

■ Alternatively, the Union contends that section 2 First of the Railway Labor Act, 45 U.S.C. § 152 First, imposes on NE a statutory duty to negotiate with it about the protection to be accorded employees in the event the merger takes place. At the outset, NE argues that the federal courts are without jurisdiction to grant the relief asked in this case because the Union has refused to submit the dispute to the Na-

7. Although it has long been held that strikes could be enjoined pending resolution of contract disputes by the Adjustment Board, *see* Brotherhood of Railroad Trainmen v. Chicago R. & I. R. R., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, there has been doubt whether an injunction could be issued temporarily barring changes in working conditions. *See generally* Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 386–97 (1960). We believe, however, that the same policies which led the Supreme Court to hold that a court may condition an anti-strike injunction on maintenance of the status quo, Brotherhood of Locomotive Eng'rs v. Missouri-K.-T. R. R., 1960, 363 U.S. 528, 534, 80 S.Ct. 1326, 4 L.Ed.2d 1379, may also require that a union be able to enjoin changes in working conditions if it would be impossible otherwise later to make the workers whole. *See* Local Lodge 2144 v. REA, 2 Cir., 1969, 409 F.2d 312; Westchester Lodge 2186 v. REA, 2 Cir., 1964, 329 F.2d 748.

8. There is no occasion for us to pursue some quite different arguments that occur to us that might militate against an injunction if the matter *were* before the Board.

tional Mediation Board and because section 5 First of the Railway Labor Act, 45 U.S.C. § 155 First, gives the Board jurisdiction over any such major dispute "not adjusted in conference between the parties or where conferences are refused." We disagree. There can be no doubt as to the court's power generally, when one party refuses to bargain on the ground that it has no duty to do so, to order such bargaining and, if necessary, to enjoin any change in working conditions pending completion of the negotiations. 45 U.S.C. § 156; Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; cf. Chicago & N. W. Ry. v. United Transportation Union, 1971, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187. Judicial relief is not barred in this case by the Union's failure to exhaust administrative channels. The mediation procedures provided for major disputes are designed merely to bring the parties into agreement; they cannot perform the adjudicative function of deciding whether a party has a legal duty to bargain about a particular subject. See Pan American World Airways v. International Bhd. of Teamsters, ante.

■ NE suggests further that since the Union has raised a minor dispute as to whether the collective bargaining agreement requires negotiations about the merger, it cannot simultaneously take the position that there is also a major dispute arising from the merger because, regardless of the contract, there is a statutory duty to bargain. Cf. Rutland Ry. v. Brotherhood of Locomotive Eng'rs, ante. We might agree if the clause were one, as in Rutland Railway, that could arguably be construed as a clear waiver of a statutory right to bargain, but we find no merit in the company's position when the contract may, instead, impose an additional bargaining obligation, and certainly could not be read as an intentional relinquishment of any statutory rights.

■ We turn, then, to the merits of the statutory argument. Though it does not ask to participate in the decision whether to merge, the Union urges that the court's holding that it cannot bargain about the effects of the merger rests on the faulty premise that the merger itself is non-negotiable. In making this argument, it relies on Fibreboard Paper Products Corp. v. NLRB, 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, in which the Court held that at least some managerial decisions (in that case, subcontracting) may be the subject of mandatory collective bargaining. The Union, however, reads Fibreboard too broadly. There the company's decision to contract out maintenance work previously done by its own employees did not alter its basic operations: the work was still to be performed in the same plant; no capital investment was contemplated; the independent contractor was to do the same work as the present employees under similar conditions of employment. Courts have consistently refused to extend the duty to bargain recognized in Fibreboard to analogous management decisions which are more central to management's autonomous control over the direction of the business' operations.[9]

There are a number of reasons why we believe Fibreboard should not be extended to guarantee a union participation in a decision to merge. A merger is initially only a change in the ownership of the company. The impact of such a decision on jobs is not nearly so direct or immediate as the decision to subcontract work. While the change may eventually affect job security, such

---

9. See Textile Workers Union v. Darlington Mfg. Co., 1965, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (termination of entire business); NLRB v. Acme Industrial Products, Inc., 6 Cir., 1971, 439 F.2d 40 (relocation); Morrison Cafeterias Consol., Inc. v. NLRB, 8 Cir., 1970, 431 F.2d 254 (decision to shut down part of a business); NLRB v. Drapery Mfg. Co., 8 Cir., 1970, 425 F.2d 1026; NLRB v. Royal Plating & Polishing Co., 3 Cir., 1965, 350 F.2d 191; NLRB v. Rapid Bindery, Inc., 2 Cir., 1961, 293 F.2d 170.

an effect is not an inevitable one, and could be bargained about separately from the merger itself. *Compare* Note, Automation and Collective Bargaining, 84 Harv.L.Rev. 1822, 1839 (1971). More basically, the decision to merge is much nearer the core of entrepreneurial control. It is the type of decision which Mr. Justice Stewart distinguished in *Fibreboard,* 379 U.S. at 223, 85 S.Ct. at 409:

> "Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. . . .
> [T]hose management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area [subject to collective bargaining]."

*See, e. g.,* NLRB v. Drapery Mfg. Co., ante n. 9; NLRB v. Royal Plating & Polishing Co., ante n. 9; NLRB v. Transmarine Navigation Corp., 9 Cir., 1967, 380 F.2d 933; General Motors Corp., 191 N.L.R.B. No. 149, 1971 CCH NLRB ¶ 23,264.

To require an employer to include the union, in some cases possibly many unions, in discussions concerning a possible sale of the business would infringe greatly upon his control over his investment. Moreover, the nature of the decision itself makes it excessively burdensome to bring the union into the decision-making process. *See General Motors Corp.,* ante. Unlike a proposed subcontract, merger negotiations require a secrecy, flexibility and quickness antithetical to collective bargaining. Nor are the employees in a position to judge the complex financial considerations often involved. The economic necessity for a

merger cannot be eliminated by bargaining in the same way as could Fibreboard's need to subcontract its maintenance work. We find no error in the district court's conclusion that the NE merger need not be made the subject of collective bargaining. *See* NLRB v. Transmarine Navigation Co., ante; Pennsylvania R. R. v. Transport Workers Union, E.D.Pa., 1962, 202 F.Supp. 134; *General Motors Corp.,* ante.

This, however, does not end the matter, for the Union asks to bargain about the impact of the merger on employment conditions rather than about the merger itself. Initially, it can be agreed that employment security falls within the ambit of "rates of pay, rules and working conditions," 45 U.S.C. § 152 First; *see* Walker v. Pennsylvania-Reading Shore Lines, 1948, 142 N.J.Eq. 588, 61 A.2d 453, and that employers have an obligation generally to bargain about seniority, severance pay, and other matters relating to employment security. *E. g.,* NLRB v. Frontier Homes Corp., 8 Cir., 1967, 371 F.2d 974. It is equally clear that a company must give prior notice to the employees' representatives of any managerial decision which will have an impact on employment security and conditions so that the union will have an opportunity before the change takes place to negotiate concerning how the employees are to be protected.[10] For example, when a company decides to relocate, although it cannot be required to bargain about whether and where to move, it can be forced to negotiate such matters as whether present employees will be given a right of first refusal, whether they will be paid for relocation expenses if they follow the company, and what economic relief they will be given if they do not. *See, e. g.,* NLRB v. Die Supply Corp., 1 Cir., 1968, 393 F.2d 462, 467.[11] We must decide whether in light of these general principles the district court committed a clear error of law in

---

10. In the case at bar there is no allegation that the notice given the Union of the merger was insufficient.

11. *See also* Morrison Cafeterias Consol., Inc. v. NLRB, ante n. 9 (partial closing); NLRB v. Drapery Mfg. Co., ante n. 9 (complete closing).

refusing the order requested by plaintiffs.

While a merger, too, affects employment security, it does so in a manner somewhat different from that of these other shifts in the corporate enterprise. A merger, unlike a decision to relocate, to shut down a plant, or to terminate operations altogether, does not immediately and directly eliminate jobs. What it does, instead, is substitute a new employer who may not be bound by all the terms of the present collective bargaining agreement,[12] and who may make further management decisions, such as integrating the operations of the two companies, which will eliminate jobs. A merger is different, also, in the nature of the decision itself. The other entrepreneurial changes we have discussed are characteristically unilateral, and affect only one firm. A merger, on the other hand, is the result of the decisions of two or more companies, depends on negotiations between the corporations involved, and affects the employees and the business of all the firms joined.

These distinctions make it inappropriate to impose on a company about to be acquired by another in a merger an unlimited duty to bargain about the effects of the acquisition on employment security. Since the merger itself is not the proximate cause of job displacement, which will occur only as a result of management decisions subsequently made by the surviving company, any negotiations between the company being absorbed, in this case NE, and its union about what protection the employees should have against such displacement would be recklessly speculative, unless that company has knowledge of and control over the acquirer's plans. See Martin Marietta Corp., 159 N.L.R.B. No. 59, 1966 CCH NLRB ¶ 20,559; cf. NLRB v.

Transmarine Navigation Corp., ante. The only way NE could regulate the postmerger management decisions of Delta would be to renegotiate the merger. Even were the bargaining to focus entirely on the impact of the merger itself on employment security, renegotiation of the merger would be the likely result. Ignoring the matter of the delay pending bargaining, see ante, renegotiation might be necessary if Delta balked at any highly restrictive employment security terms NE might be forced to agree to.[13] In any event, renegotiation is the only means by which NE could assure its employees that whatever conditions it agreed to would bind Delta.[14] Indeed, the Union's request that the court "issue a judgment directing Northeast . . . to incorporate the results of the . . . bargaining in any final merger agreement with Delta" suggests that renegotiation of the merger is precisely what the Union ultimately seeks.

We do not share the Union's equanimity at this prospect. To allow the Union to force a company to bargain about the effects of its management decisions to the extent of forcing it to forego the proposed change in operations would be in effect to take away from it the freedom to make the decision in the first place. We have no doubt but that an employer, bargaining about the effect of a relocation on employment conditions, could refuse to discuss as unreasonable any labor protective terms that would make it prohibitively expensive to move. See generally Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1416 (1958). Where it is clear, as in the case of a merger, that bargaining about some effects of the decision would be ineffectual unless the company could be required to renegotiate the merger, we be-

---

12. See note 5, ante. The danger that a successor employer will not be bound by the specific terms of a collective bargaining agreement one of its constituent corporations had with its employees depends in part on whether the successor integrates the operations of the constituent firms, see McGuire v. Humble Oil & Re-

fining Co., 2 Cir., 1966, 355 F.2d 352, cert. denied 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004, and therefore is itself the function of management decisions yet to be made.

13. See page 7, ante.

14. See notes 5 and 12, ante.

lieve that the duty to bargain about those effects does not arise at all. Possibly were the need for negotiation compelling, we would feel differently, but in this case where Delta's employees, who would have no opportunity to participate, could be injured by whatever benefits NE's employees secure in premerger negotiations with their own employer, need points both ways.

Our discussion of the duty to bargain about the effects of a merger on employment conditions has so far been general. We have deferred until now the question of whether the regulation of the airline industry by the Civil Aeronautics Board in any way alters the scope of the duty. As we have pointed out, the Civil Aeronautics Act permits only those airline mergers which are found by the CAB to be not inconsistent with the public interest. 49 U.S.C. § 1378. The Board, in executing its responsibility, may condition approval of the merger on certain changes in and integration of the operations of the combining airlines. While this strengthens the proximity between the merger and its employment effects, that alone does not require that we expand the scope of bargaining to include postmerger working conditions. The effects of the NE-Delta merger still depend on changes the nature of which are not at present known, because the CAB has not yet issued its order. Indeed, since the merger cannot proceed without CAB approval, requiring NE to bargain over its effects in this case would be even more likely to deprive NE of control over the decision to merge than it would an unregulated company. In an unregulated industry, if highly restrictive labor protective provisions in a collective bargaining agreement make unfeasible certain planned postmerger operating changes, the acquiring corporation may still be willing to proceed with the acquisition, foregoing the originally planned changes. This option is not available in an airline merger where the parties may not subsequently decide not to make changes on the proposals of which the CAB may have relied in approving the merger. In such circumstances, the bargaining might either be ineffectual, if the Board order displaces the collective bargaining agreement even to this extent, cf. Kent v. CAB, ante, or might interfere with the decision to merge. This latter effect, in addition to being contrary to our conclusion that an employer generally may not be required to bargain about the merger itself, would be inconsistent with the design of the economic regulation of the airline industry. The Civil Aeronautics Act authorizes the CAB to condition approval of airline mergers on the acceptance by the parties of labor protective provisions designed to protect the employees of the merged airlines from any adverse impact the merger may have on conditions of employment, see Kent v. CAB, ante 204 F.2d at 265, and also to establish machinery for the peaceful settlement of any labor-management disputes arising out of the merger. See American Airlines, Inc. v. CAB, ante. One of the policies behind this grant of authority to the CAB is to prevent mergers adjudged by the Board to be in the public interest from being obstructed by labor disputes.[15] Because of the danger of such obstruction, courts have held that the procedures of the Railway Labor Act are not available for disputes arising out of the merger which pertain to subjects covered by the Board's labor protective order, and should therefore, instead, be resolved by

15. While the legislative history of the Civil Aeronautics Act is silent on this point, the scheme of the economic regulation of the airline industry is borrowed in large part from the regulation of the rail industry by the Interstate Commerce Act, 49 U.S.C. § 1 et seq. The history of that Act does evidence a concern that labor disputes arising from rail consolidations be subject to authoritative resolution in order that economically desirable mergers not be obstructed. See Brotherhood of Locomotive Eng'rs v. Chicago & N. W. Ry., 8 Cir., 1963, 314 F.2d 424, cert. denied 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53; Railway Labor Exec. Ass'n v. United States, 1950, 339 U.S. 142, 150–154, 70 S.Ct. 530, 94 L.Ed. 721.

the procedures set forth in that order, even though the parties have, in private collective bargaining contracts, agreed to terms inconsistent with the order. *See* Kent v. CAB, ante; American Airlines, Inc. v. CAB, ante; *cf.* Nemitz v. Norfolk & W. Ry., 6 Cir., 1971, 436 F.2d 841, 845–848, aff'd, 404 U.S. 37, 44, 92 S.Ct. 185, 30 L.Ed.2d 198. We believe, likewise, that the duty to bargain, even about terms which would supplement the CAB order,[16] must be limited in such a way as to assure that the negotiations will not jeopardize a merger approved by the CAB. Therefore, even matters which the company would otherwise have to negotiate under our interpretation of the Railway Labor Act, may be excluded from the negotiations if bargaining, with its corollary of a right to strike, would have the effect of somehow jeopardizing the merger.

■ We conclude, therefore, that NE cannot be required to bargain about the protection to be accorded its employees in the event of particular postmerger operating changes to be mandated by the CAB or to be made by Delta, nor about the employment rights of NE employees vis-a-vis Delta employees.[17] The Union having asked below, and argued here, for an all-or-nothing order, we do not feel called upon to consider what, if any, incidental matters it might be appropriate to bargain about,[18] except to say that even as to such matters, NE may, without violating its duty under 45 U.S.C. § 152 First to negotiate reasonably, refuse to incorporate any agreements reached into its merger agreement with Delta and may also refuse to discuss any terms which in its good faith opinion would force renegotiation of the merger or otherwise jeopardize its consummation.

Since NE had no obligation to bargain generally about the merger and its effects, the district court properly exercised its discretion not only in refusing to order NE to bargain, but also in declining to enjoin the merger pending completion of negotiations. There is no statutory command that the merger be enjoined. Section 6 of the Railway Labor Act, 45 U.S.C. § 156, barring any changes in working conditions during the course of bargaining, does not apply because, as we have already held, the merger itself is not a change in working conditions. Since an injunction, in part because of the Union's conduct, would be potentially disastrous, see ante, it would be inequitable to issue one simply to guarantee the Union an opportunity to bargain as to incidental matters.

Affirmed.

---

16. A private agreement supplementing the Board's order may be enforceable, *see* Arnold v. Louisville & N. R. R., M.D. Tenn., 1960, 180 F.Supp. 429, aff'd sub nom. Batts v. Louisville & N. R. R., 6 Cir., 1963, 316 F.2d 22, even though one inconsistent with the order is not. *See* Kent v. CAB, ante; Nemitz v. Norfolk & W. Ry., ante.

17. We express no opinion at this time as to whether Delta may be required to negotiate separately with NE workers about any of the changes when they occur. *See* Overnite Transportation Co. v. NLRB, 4 Cir., 1967, 372 F.2d 765, 768, cert. denied 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101; *cf.* Mine Workers v. NLRB, 7 Cir.,

1963, 319 F.2d 428, rev'd on other grounds 375 U.S. 396, 84 S.Ct. 453, 11 L.Ed.2d 412; NLRB v. McFarland, ante.

18. Although NE expressed some willingness to bargain about incidental matters, the Union, by refusing apparently to negotiate about anything until NE agreed to various demands, including, most strikingly, a consolidated seniority list comprehending the employees of both companies, which we have held to be outside the scope of any duty to bargain, made it impossible to know the extent of NE's willingness. We would be flying blind were we to try now to define the scope of the duty to negotiate incidental matters.