Mrs. Cornelius Cuthbertson HILL,
Appellee,

v.

W. A. ROWLAND and B. S. Treadaway,
Appellants.

No. 72–1258.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1972.

Decided March 14, 1973.

J. J. Wade, Jr., Charlotte, N. C. (R. C. Carmichael, Jr., G. Patrick Hunter, Jr., and Wade & Carmichael, Charlotte, N. C., on brief), for appellants.

George S. Daly, Jr., Charlotte, N. C., submitted on brief, for appellee.

Frank G. Carrington, Jr., Executive Director, Americans for Effective Law Enforcement, Inc., on brief, for amicus curiae, Americans for Effective Law Enforcement, Inc.

Before BOREMAN and BRYAN, Senior Circuit Judges, and CRAVEN, Circuit Judge.

BOREMAN, Senior Circuit Judge:

This is a civil action wherein the plaintiff, Mrs. Cornelius Cuthbertson Hill, seeks to recover compensatory and punitive damages from the defendants, police officers of the City of Charlotte, North Carolina.

On August 18, 1969, Mrs. Hill, black, a 40-year old widow, was employed as a taxi-driver in Charlotte. At about 10 A.M. on that day, she parked her cab across from, and started across the street toward, an establishment known as "Mr. Fred's," her purpose, as subse-

quently stated by her, being to arrange with the proprietor to have her shoes repaired at a later date.[1] "Mr. Fred's" had been under surveillance by the Charlotte police during the preceding week due to an informant's tip that an illegal lottery[2] was there being operated. On three separate days during the surveillance, and shortly after several other persons had entered and left, Mrs. Hill had been observed entering the premises, staying only one or two minutes, then returning to her taxi and driving away. At the moment of her arrival on the morning of August 18, Charlotte police officers, including defendants W. A. Rowland and B. S. Treadaway, who were inside the premises known as "Mr. Fred's" executing a search warrant, had seized certain evidence of an illegal lottery and had arrested several persons present including the proprietor who was found with "tickets," money and an adding machine on a table.

Mrs. Hill testified that she had started across the street after parking her cab when she saw a policeman, not in uniform, who was a "boyfriend" of hers leaning across a car parked in front of her cab, and she spoke to him but he did not answer. Someone at that time, "was hollering something about don't go there, or something." Mrs. Hill "started back across the street to slap the hell out of him because he didn't speak to me," but was, she claimed, grabbed from behind by a white man who pushed her into "Mr. Fred's." She was not able to identify the person who had so pushed her and there was no evidence that the officers inside the premises being searched had any knowledge that her entry was involuntary or accomplished by force. Upon her entrance, officers Treadaway and Rowland recognized Mrs. Hill as the black female observed on previous occasions during the surveillance. According to his testimony, officer Treadaway had been told by a reliable informer that she was periodically "taking away the [lottery] tickets." Mrs. Hill was officially placed under arrest by officer Rowland.

Mrs. Hill was searched by a female police officer who was participating in the raid and who testified that she first identified herself as "Officer Gillespie."[3] No evidence of participation in a lottery was found on plaintiff's person. A pistol, which was described as a ".38 special" and which she carried in a holster on her hip, was taken from her. Mrs. Hill testified: "And then she [the female officer] started unbuttoning my blouse. I had on a blue blouse and she started unbuttoning it down the front. And then I started cursing and reached for my gun . . . and they grabbed my gun because I was going to shoot anybody trying to take my clothes off." The female officer denied searching the "upper portion of Mrs. Hill" and testified that the gun was confiscated prior to the search.

Mrs. Hill was taken before a Magistrate at the recommendation of defendant Treadaway. Evidence was presented to the Magistrate but, at the request of Treadaway, no warrant was issued for her arrest and she was released. However, the police kept her pistol temporarily and required her to produce evidence of lawful ownership. She was released

---

1. "Mr. Fred's" was a one-story shack of cheap construction. Mrs. Hill did not then have with her the shoes to be repaired. Shoe repair was not done at "Mr. Fred's." Mrs. Hill testified that the actual work was done "about a block down the street," but that pick-up and delivery were accomplished at "Mr. Fred's" since the repair man had another job and was not always at his shop.

2. The lottery was referred to during the trial and by the court in its charge to the jury as "numbers rackets" and "butter and eggs racket."

3. Plaintiff testified that none of the officers said anything about who they were, and that she did not realize they were police officers until about 15 minutes after entering "Mr. Fred's" when "a man took out some kind of radio and called for some police cars and that's when I knew it was the police."

and upon her return with persuasive evidence of lawful ownership of the pistol it was delivered to her.

Mrs. Hill instituted this suit in the district court against the several named defendants and advanced various theories of liability. The case ultimately went to the jury for a determination whether the arresting officers, Rowland and Treadaway, were liable to Mrs. Hill for (1) a violation of her civil rights under 42 U.S.C. § 1983, which violation assertedly arose from her warrantless arrest without probable cause, (2) false imprisonment, and (3) assault and battery, the latter two theories presented in plaintiff's complaint under the common law of North Carolina. The jury found each defendant liable under the first two theories but not under the third, and further found Mrs. Hill entitled to recover damages in the amount of $2.50 from each of the two defendant officers for each wrong. Rowland and Treadaway prosecute this appeal, not because of the amount of damages awarded but, as they say, because of the principle involved.

The issue is not unimportant. It concerns the standards by which police officers are to be governed and which they must observe and satisfy when making an arrest without a warrant if they are to avoid civil liability under § 1 of the Civil Rights Act of 1871, 17 Stat. 13, now 42 U.S.C. § 1983. In their answer to the complaint, under "First Defense," the police officers alleged a "good faith" defense by stating: ". . . . Plaintiff was temporarily detained in good faith by some police officers on suspicion of operating a lottery, with reasonable grounds and probable cause to do so." Under "Motions" in their answer, the police officers additionally stated that they were acting upon reasonable grounds and probable cause while attempting to locate and arrest persons charged in warrants with criminal offenses. The defendants requested that the jury be instructed as follows:

"4. The defense of good faith and probable cause is available to the defendants, and if you find that any defendant arrested the plaintiff, and that said defendant reasonably believed in good faith that the arrest was constitutional, then it would be your duty to render a verdict for the defendant even though the arrest was in fact unconstitutional."

This requested instruction was based upon Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), a case which arose under § 1983 and which concerned the standard of civil liability for arrests made under a law later held unconstitutional. The Court there stated:

"We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." 386 U.S. at 557, 87 S. Ct. at 1219.

The district court refused to instruct the jury as requested for the stated reason that Pierson v. Ray "is not a pertinent authority in this case." Instead, the court instructed the jury:

"The standard for arrest without a warrant amounts, instead, to a requirement that the arresting officer have probable cause and this is an objective standard, not personal to the law enforcement officer, and this standard has been very succinctly expressed by the Supreme Court a few years ago in Beck against Ohio [379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)] as follows: Whether an arrest is constitutionally valid depends upon whether at the moment the arrest was made the officers had probable cause to make it, whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man to (sic) [in] believing that the petitioner had committed or

was committing an offense, bearing in mind that as in the case of searches the warrant is the procedure of choice.

.    .    .    .    .    .

" . . . The basic question is not the rights of law enforcement officers nor what the attitude of this community is towards, or the feeling of people of this community towards arrests, but the question is whether as between the individuals here the circumstances gave these officers probable cause to believe that a violation of law was taking place by Mrs. Hill at the time she was arrested. And this is the simplest statement I know to make of the question, the first question you've got to decide.

"The concept of probable cause is not a personal thing. We are not here trying any case whether the defendants are mean or not, whether they acted in good faith belief that what they were doing was correct. The standard which, as I read the constitution and the decisions, the standard which applies doesn't challenge the good faith of the defendants. It simply asks you to decide whether under the circumstances, at the time of the arrest, a reasonably prudent man in their circumstances, knowing what they did, had probable reason or probable cause to believe that Mrs. Hill was then and there committing or had at that time committed a crime."

We think the lower court was in error in instructing the jury that the test of liability in this § 1983 action was the objective test of "probable cause" rather than the partly subjective test of the reasonable good faith belief of the police officers in the legality of the arrest.

In Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 456 F.2d 1339 (2 Cir. 1972), the court reviewed the defense of good faith and

probable cause which "[a]t common law the police officer always had available to him," stating that such defense "has been consistently read as meaning good faith and 'reasonable belief' in the validity of the arrest or search. Restatement (Second) of Torts § 121(b) (1965); 1 Harper & James, The Law of Torts § 3.-18 at 277 (1956)." Bivens, supra, 456 F.2d at 1347. The court held that this defense was available to FBI and Federal Narcotic Agents in civil suits against them for damages for unconstitutional arrest or search. Since federal officers were the defendants in Bivens and were not purporting to act under color of a state statute, ordinance, regulation, custom, or usage, § 1983 was not directly involved. It is clear, however, that the Second Circuit thought the standards for federal and state officers should be the same, Bivens, supra, 456 F.2d at 1346–1347.[4] Judge Medina summarized in Bivens:

"Therefore, to prevail the police officer need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection." 456 F.2d at 1348.

We approve the holding in Bivens as reflected in the court's opinion. We hold that the principles therein enunciated are applicable to the instant case.

4. The court expressly stated, "We believe this to be the same defense held applicable to cases arising under Section 1983.

Pierson v. Ray, supra, 386 U.S. 547, 87 S.Ct. 1213 (1967)." 456 F.2d at 1347.

In her brief Mrs. Hill does not take issue with *Bivens*, but rather argues that the district judge complied with its requirements since he defined probable cause in terms of "reasonably trustworthy information" sufficient to satisfy a "prudent man" that a crime had been or was being committed. We do not agree. As Judge Lumbard so clearly explained in his concurring opinion in *Bivens*, 456 F.2d at 1348:

"Thus there are two standards to be considered. The first is what constitutes reasonableness for purposes of defining probable cause under the fourth amendment for the protection of citizens against governmental overreaching. The other standard is the less stringent reasonable man standard of the tort action against government agents. This second and lesser standard is appropriate because, in many cases, federal officers cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves. It would be contrary to the public interest if federal officers were held to a probable cause standard as in many cases they would fail to act for fear of guessing wrong. Consequently the law ought to, and does, protect government agents if they act in good faith and with a reasonable belief in the validity of the arrest and search."

We conclude that Judge Lumbard's analytical statement with respect to standards applicable to federal law enforcement officers should be held to apply with equal force to state law enforcement officers.

*Bivens* has recently been approved and applied by the Sixth Circuit in Jones v. Perrigan, 459 F.2d 81 (1972). And in Richardson v. Snow, 340 F.Supp. 1261 (D.Md.1972), the district court stated its views which we quote with approval as follows:

"This court believes that the reasoning of the Second Circuit in *Biv-*

*ens, supra,* is as valid and as applicable in actions under § 1983 involving state or local law enforcement officials as it is to federal law enforcement officers. As stated in Whirl v. Kern, 407 F.2d 781 at 790 (5 Cir. 1969), 'An arrest is often a stressful and unstable situation calling for discretion, speed, and on-the-spot evaluation.' To require the police officer, under penalty of personal liability for damages if he is in error, to make on-the-spot complex and intricate legal determinations of the existence or absence of probable cause under the Fourth and Fourteenth Amendments when the courts, acting in a more leisurely and relaxed atmosphere, have difficulty in making these decisions is to place the policeman in just such a position of acting at his peril as was declared to be intolerable in Pierson v. Ray, *supra,* 386 U.S. at 555, 87 S.Ct. at 1218. It is no answer to this intolerable burden to cite cases such as Beck v. Ohio, 379 U.S. 89, at 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), where a subjective good-faith test for actions of the policemen in an arrest was rejected since those cases deal with constitutional standards applicable to the admission of evidence in the trial of a criminal case rather than to the question of civil liability of a policeman who, in good faith and with a reasonable belief in the legality of his acts, has attempted to perform his duty to protect society. Such a distinction in this court's view is entirely compatible with the balancing of the interest of society in attempting to protect itself from the effects of criminal behavior and of the interests of the individual in the enjoyment of his constitutional rights." 340 F.Supp. at 1266.

█ In her complaint, and in addition to her claim of a cause of action under § 1983, plaintiff alleged that, on the facts as set forth by her, she had "a right . . . to recover damages . . . for false imprisonment, under the com-

mon law of the State of North Carolina." At trial the defendants requested that the jury be instructed upon North Carolina statutory law governing arrest without a warrant, N.C.Gen.Stat. § 15–41 (1965 Repl.Vol.). The court did instruct the jury, in essence, as to the substance of subsection (1) of the statute[5] but without any elaboration or explanation.

The court then instructed the jury further:

"[Plaintiff's] contention also is that the defendants admitted on the spot that they had no basis to keep her and that, whether the original arrest was lawful or not, continued acts of false imprisonment took place, starting from the time they admitted they made a mistake and that everything that happened to her following her search there at the premises, the taking of her to the police station and subjecting her to identification and fingerprint procedures, the extended withholding of her property, that is, the pistol, that all of those things, even on the view of the case presented by the defendants, were unlawful and were violations of her rights, constitutional or otherwise. And on that phase of the question the Court charges you that the fact that somebody is under investigation does not justify his imprisonment and that if you believe the testimony of the defendants on that subject, that taking her to the police station and the other things that happened to her after that were done, such parts of that as you find were done by Mr. Rowland or were supervised or directed by Mr. Treadaway did constitute violations of her rights. *This is without regard to what you might find about the lawfulness of the original arrest.*

. . . . . .

"Now, with regard to the circumstances that occurred after the original arrest, here again, as the Court advised you a while ago, *unless the original arrests were lawful*, there could be no justification for doing the things that were done after she had been searched unless there remained as of the time of the search some reason to keep her, not just suspicion, not just investigation, but some continuing·legal reason within the standards that have been advanced, then there's been no showing of any basis for her continued imprisonment and she would be entitled to recover for whatever damages she sustained by being taken to the police station and fingerprinted and kept and then having to go to the trouble of getting her gun back." [Emphasis supplied]

In addition to the confusion apparent in the charge as quoted immediately above the court made no attempt to discuss or clarify N.C.Gen.Stat. § 15–41 (1) as the court would interpret and apply it in the context of a civil action such as here involved. Although the "good-faith" issue was discussed at length by counsel and the court in relation to the constitutional question under § 1983, there is nowhere in the record to be found any argument or discussion as to the applicability of the "good-faith" defense to the action for false imprisonment under either the North Carolina statute or the common law. Independent investigation indicates the possibility that conflicting inferences might be drawn from existing authority. *Cf.* Perry v. Gibson, 247 N.C. 212, 100 S.E. 2d 341 (1957), with Hicks v. Niven, 210 N.C. 44, 185 S.E. 469 (1936).

In determining the proper disposition of this appeal there is an additional consideration. It is clear from the tran-

5. § 15–41. When officer may arrest without warrant.—A peace officer may without warrant arrest a person:
   (1) When the person to be arrested has committed a felony or misdemeanor in the presence of the officer, or when the officer has reasonable ground to believe that the person to be arrested has committed a felony or misdemeanor in his presence.

script of the trial proceedings, from the instructions of the trial judge, and from the issues as to liability as propounded to the jury, that the predominant issue at trial was the one presented under § 1983 and the members of the jury were given little or no information or instruction which would enable them mentally to separate successfully the issue of false arrest from the issue of false imprisonment. The court submitted to the jury the following questions as to each defendant, indicating that each question be answered categorically:

Was the plaintiff denied due process of law by arrest without probable cause under the circumstances, or otherwise . . . .

Was the plaintiff unlawfully arrested and deprived of her liberty . . . .

The jury answered "Yes" to each question as to each defendant. The first question, it would seem, was designed to present for determination the issue arising under § 1983; the second, apparently, was intended to present for determination the issue of false imprisonment under North Carolina law.

Without reference to the law of North Carolina we note that an improper or illegal arrest and a period of detention, of whatever length, may carry with it an implication of false imprisonment. The jury, in answering the second question in the affirmative, may have found that Mrs. Hill was falsely imprisoned due solely to the fact that they had determined that she was arrested without probable cause. The questions to be answered categorically reflect this situation. It would appear that if the first question were answered "Yes" the second could not be answered otherwise than in the affirmative. However, the determination in response to the first question above was made under improper instructions from the court. Thus we find it necessary to reverse and remand for a new trial as to both issues which were determined by the jury in favor of the plaintiff.

Reversed and remanded.