**Elizabeth Ann NORTON, Plaintiff,**

v.

**John TURNER et al., Defendants.**

**Civ. A. No. 76–3–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Jan. 26, 1977.

**140**

Phil J. Hirschkop, Alexandria, Va., for plaintiff.

James R. Hubbard, Asst. U.S. Atty., Alexandria, Va., Joseph P. Dyer, Arlington, Va., Plato C. Cacheris, Alexandria, Va., Brian P. Gettings, Arlington, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, Elizabeth Ann Norton, brings this action against certain federal and local law enforcement officers and the United States of America to redress an alleged wrongful entry and search of her apartment. The plaintiff seeks both monetary and declaratory relief. The action is brought pursuant to the Constitution of the United States, 42 U.S.C. § 1983 and state law. Jurisdiction is attained pursuant to 28 U.S.C. §§ 1331, 1332, 1343 and 1346(b). The matter comes before the Court on cross-motions for summary judgment as to liability.

The gravaman of the plaintiff's complaint is the contention that her apartment was illegally entered by the individual defendants in violation of her rights under the Fourth Amendment to the Constitution. Her constitutional claims are premised upon *Bivens v. Six Unknown, etc., Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the provisions of 42 U.S.C. § 1983. Pendent state common law claims of assault, trespass, and false imprisonment are also asserted. The United States of America is sued under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2674, and 2680(h).[1] The defendants contend

---

[1] 28 U.S.C. § 1346(b) confers exclusive jurisdiction upon district courts

of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused

by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the

that their actions were legal under the Fourth Amendment and the common law. Secondarily, they maintain that they acted under a reasonable good faith belief in the legality of their actions and, therefore, are immune from suit. *See Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bivens v. Six Unknown, etc., Agents,* 456 F.2d 1339 (2d Cir. 1972); *Hill v. Rowland,* 474 F.2d 1374, 1377 (4th Cir. 1973). Plaintiff's contentions are that the alleged entry was illegal, that the claims of immunity of the individual agents are not ripe for decision under the instant motions, and that the immunity defense, if any, is not available to the United States.

## I. *The Facts*

The parties have stipulated many of the material facts. At approximately 8:13 p. m. on Saturday, March 15, 1975, Officer Donald C. Green of the Alexandria, Virginia Police Department received an anonymous telephone call regarding the whereabouts of Patricia Campbell Hearst, then a nationally renowned fugitive. William and Emily Harris were also being sought on related matters. Officer Green immediately advised Agent Mackey of the Federal Bureau of Investigation's Alexandria field office of the call and relayed the conversation as follows:

"You know Patty Hearst is supposed to be in Pennsylvania but she's not. She's currently at 649 Notabene Drive, Apartment 10, in Alexandria and she's been there for the last week or ten days. She has cut her hair and she's with one of the people who left with her from California."

Agent Mackey thereupon advised Special Agent-in-Charge, Robert Kunkel, who directed that the investigation of the anonymous tip be headed by Special Agent Robert O'Brien. Special Agent O'Brien was the Coordinator for the Alexandria Division for the nationwide search for Miss Hearst and other allegedly connected fugitives. The Hearst investigation was code named HEARNAP by the FBI. Upon being contacted and advised of the tip, Special Agent O'Brien took charge of the investigation. He and three other FBI agents proceeded to the Alexandria Police Department headquarters. It should be noted that the HEARNAP file contained at that time, in part, the following information: (1) the fugitives generally resided in low income areas; (2) their general mode of transportation was either rental cars or used vans; and (3) Ms. Hearst had reportedly cut her hair in September of 1974.

Upon arriving at the Alexandria Police Department, it was determined through the

---

law of the place where the act or omission occurred.

The liability of the United States is predicated upon 28 U.S.C. § 2674 which provides

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof. June 25, 1948, c. 646, 62 Stat. 983.

An action of this nature is authorized by 28 U.S.C.A. § 2680(h)

The provisions of this chapter and section 1346(b) of this title shall not apply to—

\* \* \* \* \* \*

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provides,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

use of locator crisscross indexes published by the telephone company, that the referred to apartment was occupied by one Victor Henry Evol, but no telephone number could be located. A check of police department records revealed that Mr. Evol was a black male who had been interviewed on July 23, 1974 by Alexandria police officers in connection with a complaint involving a concealed weapon. The information attained revealed that no charges had been brought against Mr. Evol.

Stipulated facts reveal that on March 15, 1975, Evol was not the tenant of the apartment. Plaintiff had leased the apartment on November 1, 1974 shortly after Mr. Evol had vacated the premises. On March 12, 1975, three days prior to the incident in issue, Ms. Norton, the plaintiff, was interviewed at her apartment by a local FBI agent, Larry Bartlett, in connection with an investigation of a stolen automobile. Agent Bartlett's report concerning this interview was neither dictated nor transcribed until subsequent to the incident involved herein. Accordingly, the FBI's then recent contact with and identification of the occupant of 649 Notabene Drive, Apartment 10, was not contained in the briefing preparatory to the investigation of the Hearst tip.

At approximately 9:30 p. m., March 15, 1975, the four FBI agents and two Alexandria detectives drove to a site close to the apartment in question. They were there joined by two uniformed police officers. Agent O'Brien furnished all the agents and officers with photographs and physical descriptions of the fugitives and advised them that each fugitive had been designated by the FBI as armed and dangerous. One of the Alexandria detectives, Mr. Turner, was then dispatched to survey the building. The apartment building, located in a well lighted low income area, is a separate brick structure containing ten units. The front entrance is the only method of ingress or egress save the windows. Apartment 10 is located on the third floor of the building and has only a rear view. On the night in question, there was no resident manager at the apartments and the name of the occupant of Apartment 10 was not contained on the vestibule mailbox. Parked outside the apartment units was a white van with Pennsylvania license plates.

Upon Detective Turner's return from his survey, the agents and officers proceeded to the apartment. Agent O'Brien at the parking lot briefing advised the officers of three possibilities: (1) the HEARNAP fugitives Hearst, Harris and Harris were in the apartment; (2) the tip was an attempt to set up an ambush; or (3) the tip was an attempt to harass an innocent party. At approximately 10:07 p. m., Agents O'Brien and McLaughlin and Detectives Turner and Bland proceeded to Apartment 10. The light was on and music was being played when the agents arrived. Two minutes later, Agent O'Brien knocked on the door of the apartment. At this time Ms. Norton was at home alone. She was fully dressed. The door to Apartment 10 did not contain a peephole.

Ms. Norton responded to the knock by asking "Who's there" or "Who is it"? Agent O'Brien indicated that it was the FBI. Ms. Norton requested identification. While the details of the ensuing conversation are disputed, the parties agree that the plaintiff never was shown the agents' credentials. The plaintiff turned to call FBI offices in an effort to secure some verification that the men at the door were, in fact, agents. The agents and detectives then attempted to forcibly open the door by striking it. Ms. Norton, fearing that the door would be destroyed, unlatched the lock and the door sprang inwardly open. The law enforcement officers entered the apartment with weapons drawn. A search of the apartment revealed no traces of the sought after fugitives.

Agent O'Brien then advised the plaintiff of the call which prompted the intrusion. It has subsequently been determined that the "tip" was probably made by a neighbor of the plaintiff with whom Ms. Norton frequently quarreled. No attempt was made by the defendants to obtain a search warrant prior to the forced entry.

II. *The Legality of the Defendants' Conduct*

 With respect to the alleged constitutional torts, the threshold issue presented is whether or not the defendants' actions were violative of the Fourth Amendment's prohibition against unreasonable searches and seizures. In the context of the instant controversy, the issue is framed in terms of the standards applicable to the execution of an arrest warrant at the residence of a third party not named in the warrant. The Supreme Court, to date, has not directly confronted the issue. *See United States v. Watson*, 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Gernstein v. Pugh*, 420 U.S. 103, 113 n.13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 480–481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Jones v. United States*, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). It is clear, however, that "if the police intended to conduct a search of a man's home for a suspect, they must *at least* have probable cause to believe that he is on the premises." *Lankford v. Gelston*, 364 F.2d 197, 202–203 (4th Cir. 1966) (emphasis added). *See also United States v. James*, 528 F.2d 999, 1017 (5th Cir. 1976); *United States v. Brown*, 151 U.S. App.D.C. 365, 467 F.2d 419, 423 (1972); *United States v. McKinney*, 379 F.2d 259, 262–263 (6th Cir. 1967).[2] Accordingly, the pivotal inquiry is the existence of probable cause that Ms. Hearst occupied Apartment 10 at the time the agents forcibly entered the apartment. To paraphrase an oft quoted definition of probable cause, this Court must determine whether, at the moment of the entry, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that Ms. Hearst was inside the apartment. *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1965); *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Husty v. United States*, 282 U.S. 694, 700–701, 51 S.Ct. 240, 75 L.Ed. 629 (1931); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). This assessment must be made in view of the cumulative effect of the facts then existing and the totality of the circumstances.

 The Court has little difficulty in concluding that the anonymous tip,[3] standing alone, is not sufficient to justify the challenged police action. The informant chose to remain anonymous. The underlying circumstance detailing the manner in which the information was gathered is also unknown. *See Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The informant had not previously provided any, much less accurate, information to the police. *Jones v. United States*, 362 U.S. 257, 267–272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Fuller*, 441 F.2d 755 (4th Cir. 1971). Nor did the informant supply information against her penal interest. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Aside from the conclusory statement that Ms. Hearst was occupying Apartment 10, the only factual assertions contained in the tip were that (1) Ms. Hearst had come to Alexandria from Pennsylvania and (2) she had cut her hair. Both of these facts were consistent with information con-

---

**2.** The plaintiff contends that the police are required to obtain a search warrant in order to lawfully execute an arrest warrant in the dwelling of a third party. Only exigent circumstances, it is submitted, can relieve the officers of this obligation. *Cf. Virgin Islands v. Gereau*, 502 F.2d 914, 928 (3d Cir. 1974). The Court is satisfied that *if* the officers had probable cause to believe that Ms. Hearst was in the apartment, their subsequent conduct was justified. The fugitives in question had demonstrated a capacity for both violence and elusive flight.

*See United States v. Cravero*, 545 F.2d 406, 416 at n.30 and text (5th Cir. 1976).

**3.** To the extent that there is any material difference, the Court is concerned with the tip as conveyed to the defendants rather than as later transcribed by the Alexandria Police Department. The parties agree that the statement quoted in the main text hereof represents the information available to these defendants at the time of their actions.

tained in the FBI HEARNAP investigation file. It was public knowledge, however, that Ms. Hearst was last known to be taking refuge in Pennsylvania. The statement concerning Ms. Hearst's appearance applies with equal accuracy to literally millions of women. In short, neither the tip itself nor the informant display the indicia of reliability necessary to warrant the forcible entry into the dwelling of a citizen of the United States in the dead of night. *Cf. Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Indeed, the Court would be hard pressed to imagine a less trustworthy basis for the drastic action taken. As noted by Judge Sobeloff, information from an "anonymous and unverifiable source is [not] probable cause for the search of a home." *Lankford v. Gelston, supra,* 364 F.2d at 202. The Court must also, however, consider any additional information obtained during the investigation which may fortify the otherwise deficient tip and, hence, support a finding of probable cause. *Whiteley v. Warden,* 401 U.S. 560, 567, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1969).

■ The defendants assert that several facts independently verified the accuracy of the anonymous tip. First, the defendants point to their police station-house investigation which erroneously revealed that a black male, who had previously been questioned but not charged in connection with a weapons violations, was the occupant of the apartment. The correlation between the inaccurate fact and the location of Ms. Hearst can only, generously, be described as tenuous. The Court similarly finds little probative value in the fact that the apartment is located in a lower income area of the City of Alexandria, Virginia. The strongest evidence the defendants have

presented on this issue is the presence of a van with Pennsylvania license plates in the proximity of the plaintiff's apartment.[4] This fact conformed with the then current information contained in the HEARNAP file as to the fugitive's former location and general mode of transportation. No attempt was made to ascertain who was the owner of the vehicle and whether it had any connection with the Hearst investigation. Even with the benefit of this information, however, Agent O'Brien cautioned the other law enforcement officials that the tip could be a prank. The only additional facts that the defendants submit support a finding of probable cause are that (1) a young female voice, as opposed to that of a black male, responded to their knock on the door; and (2) that the plaintiff refused to open the door without verifying the identity of the intruders.

A finding of probable cause in this case would give unprecedented weight to a conclusory tip from an anonymous source whose accuracy is purportedly verified only by the proximity of a vehicle bearing Pennsylvania license plates to the apartment in question. Fortunately, the Constitution requires a firmer basis of justification before sanctioning a forcible intrusion into one's home. *Lankford v. Gelston, supra.* The so-called corroboration offered by the defendants was, at best, merely consistent with a belief that Ms. Hearst occupied Apartment 10. The evidence was not affirmatively probative of that fact. In short, the Court concludes that, at the moment of entry, the facts and circumstances within the defendants' knowledge and of which they had reasonably trustworthy information were not sufficient to warrant a prudent man into believing that Ms. Hearst was inside the apartment. Accordingly, the plaintiff has established that the defendants have violated her rights under the Fourth Amendment to be secure from unreasonable searches and seizures.[5]

---

4. The van, as it turns out, belongs to the plaintiff. The defendants, however, were unaware of this fact.

5. The Court's conclusion that the entry was illegal results in the establishment of a prima

facie case of assault, trespass and false imprisonment under Virginia law. *See Montgomery*

III. *Immunity Defenses*

A. *Individual defendants*

 The individual defendants have moved for summary judgment on the basis of their alleged entitlement to a qualified immunity from monetary liability. Each of the individual defendants are law enforcement officers who, at the time of the incident in question, were acting within the scope of their official duties. Accordingly, these defendants will not be subjected to monetary liability under the constitutional tort claims if they acted under a reasonable good faith belief in the legality of their actions.[6] *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Hill v. Rowland*, 474 F.2d 1374, 1377 (4th Cir. 1973); *Bivens v. Six Unknown, etc., Agents*, 456 F.2d 1339, 1347 (2d Cir. 1972). *Cf. G. M. Leasing Corp. v. United States*, —— U.S. ——, ——, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). The Court is of the further opinion that this qualified immunity is applicable to actions brought under Virginia law. *Yeatts v. Minton*, 211 Va. 402, 177 S.E.2d 646 (1970); *Davidson v. Allam*, 143 Va. 367, 130 S.E. 245 (1925). The cases cited by the plaintiff to the contra involve defendants who were private citizens as opposed to police officers acting within the scope of their official duties, and hence, are inapposite. *See, e. g., Zayre of Virginia, Inc. v. Gowdy*, 207 Va. 47, 147 S.E.2d 710 (1966); *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 50 S.E.2d 387 (1948).

 The Court is not satisfied, however, that the defendants' entitlement to the qualified immunity in the instant case can summarily be established. The applicability of this immunity is dependent upon factual findings. Where these factual matters are undisputed, *i. e.*, in the face of uncontroverted affidavits, summary judgment may be appropriate. *Midwest Growers Co-op. Corp. v. Kirkemo*, 533 F.2d 455 (9th Cir. 1976); *Burgwin v. Mattson*, 522 F.2d 1213 (9th Cir. 1975); *Brubaker v. King*, 505 F.2d 534 (7th Cir. 1974); *Tritsis v. Backer*, 501 F.2d 1021 (7th Cir. 1974). In the instant case, however, despite the stipulation of many facts, there remains an unresolved factual issue concerning the number of false anonymous tips that the defendants had received. The plaintiff represents that the defendants, prior to this incident, had received approximately 50 false tips. Dis-

---

*Ward & Co. v. Wickline*, 188 Va. 485, 50 S.E.2d 387 (1948); *Burgess v. Commonwealth*, 136 Va. 697, 118 S.E. 273 (1923). The defendants, of course, remain free to assert any available defenses.

**6.** The immunity afforded a police officer at common law and under 42 U.S.C. § 1983 was articulated by the Supreme Court in terms of "good faith and probable cause." *Pierson v. Ray, supra*, 386 U.S. at 555 and 557, 87 S.Ct. 1213. *See also Scheuer v. Rhodes*, 416 U.S. 232, 245, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court of Appeals in *Bivens v. Six Unknown, etc., Agents*, 456 F.2d 1339, 1347 (2d Cir. 1972) clarifies that the term "probable cause" when used in the context of immunity is not identical with the term "probable cause" in the constitutional sense. In the context of immunity probable cause translates into a reasonable good faith belief in the legality of the conduct. *Bivens v. Six Unknown, etc., Agents, supra*, 456 F.2d at 1347. This is a less stringent standard than that used in determining whether sufficient "probable cause" exists to justify the issuance of an arrest or search warrant. *See Bivens v. Six · Unknown, etc., Agents, supra*, at 1348–49 (concurring opinion). In order to successfully assert the immunity de-

fense, an officer must show (1) he acted in a good faith belief that his conduct was lawful; and (2) his belief was reasonable. The former standard is subjective while the latter is objective. *Bivens v. Six Unknown, etc., Agents, supra* at 1348.

This analysis appears to be the prevailing standard throughout the nation. *See G. M. Leasing Corp. v. United States*, —— U.S. ——, ——, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Hill v. Rowland*, 474 F.2d 1374, 1377 (4th Cir. 1973); *Jones v. Perrigan*, 459 F.2d 81, 83 (6th Cir. 1972); *Rodriguez v. Jones*, 473 F.2d 559, 605 (5th Cir. 1973); *Tritsis v. Backer*, 501 F.2d 1021 (7th Cir. 1974); *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83, 92–93 (1974); *Mark v. Groff*, 521 F.2d 1376 (9th Cir. 1975). Moreover, there is no distinction in this regard between an action brought against state officials under 42 U.S.C. § 1983 or one brought against a federal agent under a *Bivens*-type claim. *See, e. g., Rodriguez v. Jones*, 473 F.2d 559 (5th Cir. 1973); *Mark v. Groff*, 521 F.2d 1376 (9th Cir. 1975); *Bivens v. Six Unknown, etc., Agents, supra*, 456 F.2d 1339 (2d Cir. 1972); *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975).

covery relating to these tips had not been completed by the time the motions now under consideration were filed. The reasonableness of the defendants' belief in the whereabouts of Ms. Hearst—an objective standard—may be questioned in light of numerous and allegedly equally nonmeritorious "tips". Accordingly, the Court will deny the individual defendants' motion for summary judgment at this time. *See Jaroslawicz v. Seedman*, 528 F.2d 727, 737 (2d Cir. 1975); *Laverne v. Corning*, 522 F.2d 1144, 1147 (2d Cir. 1975). *Cf. Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

### B. *Immunity of the United States*

██ The liability of the United States arises, if at all, under the 1974 amendments to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*[7] The United States submits that it is entitled to assert the defenses of its agents to defeat the plaintiff's claim under that Act. In other words, the United States views its own liability as being coterminous with that of its officers. For the reasons that follow, the Court concludes otherwise.

██ The United States advances two arguments in support of its position. First, the government maintains that illegal searches and seizures conducted in a reasonable good faith belief in their legality are not "wrongful" within the meaning of the FTCA. *See* 28 U.S.C. § 1346(b). The imposition of liability for conduct which is not wrongful, it is submitted, would contravene Supreme Court decisions which prohibit the application of strict liability theories under the FTCA. *See, e. g., Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

This argument suffers the defect of a false premise. The immunity of individual officers does not serve to defeat the existence of a tort—it merely provides a defense to monetary liability.

> "Such immunity does not mean that conduct which would amount to a tort on the part of other defendants is not still equally tortious in character, but merely that for the protection of a particular defendant, or interests which he represents, he is given absolution from liability."

W. Prosser, The Law of Torts, ch. 26 at 970 (4th ed. 1971). Indeed, it has been recognized that the "good faith defense in a suit for damages brought against any federal official . . . is not assertable in the face of a quest limited to injunctive, declaratory or mandamus relief." *National Treasury Employees Union v. Nixon*, 160 U.S. App.D.C. 321, 492 F.2d 587, 609 (1974). *See also Timmerman v. Brown*, 528 F.2d 811, 814 (4th Cir. 1975). The courts will grant injunctive relief to remedy Fourth Amendment violations under appropriate circumstances. *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966); *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882 (N.D.Ill.1975). In short, the qualified immunity of a law enforcement officer does not eliminate the wrongfulness of his conduct. An otherwise illegal search does not attain legality merely because the offending officer is not subject to monetary liability. Accordingly, the plaintiff herein is not attempting to impose liability without fault. On the contra, the Court has already concluded that fault exists. The pertinent issue is whether the plaintiff's injuries are compensable under the FTCA regardless of the potential immunity of the individual defendants.

██ The second argument advanced by the United States is of more substance. As the government's liability under the FTCA is in the nature of *respondeat superior*, the United States asserts that it is entitled to the defenses of its employees. There is no disputing that both the structure of the

---

7. The parties have not raised, at least at this juncture, any questions relating to the difficulties in pursuing a claim stemming from a constitutional violation within the statutory framework primarily designed to deal with negligence actions. *See* Boger, Gitenstein and Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 U.N.C. L.Rev. 497, 517–543 (1976).

FTCA [8] and the case law arising thereunder establish that "the Government was to be made liable according to state law under the doctrine of *respondeat superior* . ." *Laird v. Nelms, supra*, 406 U.S. at 801, 92 S.Ct. at 1901. *See also Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Employers, moreover, are generally entitled to assert defenses available to their employees. Restatement (Second) of Agency § 219 (1957).

A colorable argument can be fashioned that an agent's immunity from civil liability is not a defense which can be asserted by a principal.[9] This Court is not satisfied, however, that the resolution of the important legal issue presented in the instant case should be dictated by the conceptual niceties which constitute the basis for this contention. A more concrete foundation for the Court's conclusion lies in the intent of Congress in enacting the legislation creating a cause of action against the United States.

Prior to 1974, the doctrine of sovereign immunity and the explicit exclusion of intentional torts from the coverage of the FTCA precluded a victim of an illegal search and seizure from obtaining a remedy against the United States. An aggrieved citizen's sole source for monetary compensation lay in an action against the individually offending officer brought under *Bivens v. Six Unknown, etc., Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In 1974, however, the FTCA was amended to include the following:

> *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law. 28 U.S.C. § 2680(h) (as amended).

As expressed in the Senate Report accompanying the amendment, "[t]he effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases . . . [involving] the same kind of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual

---

**8.** *See* 28 U.S.C. § 2674 which provides in part:

The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances.* (emphasis supplied)

28 U.S.C. § 1346(b) provides in part:

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death *caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.* (emphasis supplied)

**9.** Commentators have made a distinction between privileges and immunities describing a principal's ability to assert the defenses of his agent under vicarious liability theory. *See* Restatement (Second) of Agency § 217 (1957); *Cf.* W. Prosser, The Law of Torts, ch. 26, p. 970 (4th ed. 1971). A principal is said to be able to avail himself of his agent's privileges, but not his immunities. A law enforcement officer's defense to monetary liability has been termed an immunity by some, *see, e. g., Pierson v. Ray, supra*, 386 U.S. at 555, 87 S.Ct. 1213; *Bivens v. Six Unknown, etc., Agents, supra*, 403 U.S. at 397, 91 S.Ct. 1999; W. Prosser, The Law of Torts § 132 (4th ed. 1971); 2 F. Harper and F. James, The Law of Torts § 29.8 (1956); but as a privilege by others, *see, e. g.*, Restatement (Second) of Torts §§ 10, 121(b), and a simple defense as opposed to either an immunity or privilege by at least one court. *See Bivens v. Six Unknown, etc., Agents, supra*, 456 F.2d at 1347. Faithful adherence by the courts to these distinctions in discussing the shielding of officers from monetary liability is absent.

Government officials involved.)" [10] S.Rep. No. 93–588, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Ad.News pp. 2789, 2791 (1974).

The 1974 amendment to the FTCA [11] had its genesis in a series of ill-conceived and highly publicized narcotic raids which took place in the spring of 1973. The most widely publicized incidents involved the unannounced forcible nighttime entry into the homes of two families by federal narcotic agents. These raids occurred in Collinsville, Illinois. Senator Percy of Illinois was scheduled to conduct hearings concerning the reorganization of the various drug law enforcement agencies. These hearings were expanded to include testimony concerning the Collinsville incidents. In the report stemming from these hearings, Senator Percy proposed to limit the abuses done by federal officers, in part, by amending the FTCA so as to allow actions by aggrieved citizens against the United States.[12] The Senator gave two reasons why an ac-

tion must lie against the United States as opposed to one solely against the agents.

While this [an action against an individual agent] gives victims of abusive tactics some opportunity for relief, their remedy is *severely limited by the ease with which agents can usually establish the defense of having acted in good faith and with probable cause.* Moreover, causes of action against officials as individuals will, on occasion, be virtually worthless since government employees may be so lacking in funds as to be judgment proof.

S.Rep. No. 93–469, 93d Cong., 1st Sess. 36 (1973) (Individual views of Senator Percy) (emphasis supplied). Senator Percy concluded his statement with an expressed intention to introduce legislation implementing his views. It is clear from the above quoted passage that Senator Percy's view of an effective tort remedy did not include the invocation by the United States of the immunity defenses of its agents.

Shortly thereafter Senator Percy introduced the promised legislation.[13] The Sen-

10. The above-quoted passage and the entire Senate Report amply refute the defendants' contention that the 1974 amendment does not apply to the so-called constitutional torts.

11. Pub.L. 93–253, § 2, 88 Stat. 50 (March 16, 1974). The legislative history of this provision is somewhat less developed than one might have anticipated. The amendment was attached by the Senate to legislation initiated in the House of Representatives which pertained to the reorganization of certain drug law enforcement agencies. The only apparent association between the amendment to the FTCA and the House bill is the fact that the Collinsville raid was carried out by narcotics agents. The only source of legislative intent of the FTCA amendment in the House of Representatives is to be found in the debates occurring after the Senate had passed the amendment. The debate in the House focuses on the germaneness of the provision to the proposed reorganization of drug law enforcement agencies and the desirability of a more comprehensive approach to the problem of remedying illegal searches and seizures. See 120 Cong.Rec. 5285–5290 (1974). The only substantive analysis of the legislation was provided by Representative Wiggins who stated:

"[t]he amendment creates a civil cause of action by amendment to the Federal Tort Claims Act for intentional torts committed by law enforcement officers. The specific prob-

lem envisioned by the proponents of the amendment were Fourth Amendment violations where a police officer may improperly enter the premises of a suspect.

The purpose of the amendment was to give a civil remedy to the aggrieved person for injury and damages sustained by reason of the entry." 120 Cong.Rec. 5286–5287 (1974) (Remark by Rep. Wiggins).

These comments support the Court's view discussed *infra*, to the effect that the legislation was remedially oriented.

A more detailed account of the political considerations surrounding the passage of the amendment can be found in Boger, Gitenstein and Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 U.N.C. L.Rev. 497, 500–517 (1976).

12. S.Rep. No. 93–469, 93d Cong., 1st Sess. The second prong of Senator Percy's attack on law enforcement abuses was the repeal of the "no-knock" authority granted under 21 U.S.C. § 879(b). This was eventually accomplished in Pub.L. No. 93–481, 88 Stat. 1455.

13. A similar piece of legislation drafted by the Justice Department and introduced by Senator Hruska of Nebraska was also being considered at that time. S. Bill 2558, 93d Cong., 1st Sess., 119 Cong.Rec. 33499 (1973). While there were differences between Senator Hruska's proposed bill and the ultimately enacted legisla-

ate Report accompanying the bill states that '

> this provision should be viewed as a counterpart to the *Bivens* case and its progenty, in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved).

S.Rep. No. 93–588, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News pp. 2789, 2791 (1974). The Senate Report had earlier characterized the Supreme Court's decision in *Bivens* as creating "a right of action against Federal agents for illegal searches and seizures conducted in bad faith *or* without probable cause." 1974 U.S.Code Cong. & Ad.News at p. 2790 (1974) (emphasis supplied). The Report continues to note that the amendment "would submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants *or with warrants issued without probable cause.*" 1974 U.S. Code Cong. & Ad.News at p. 2791 (1974) (emphasis supplied).

Both the United States and the plaintiff point to the Senate Report in support of their respective positions. The United States contends that the repeated references to *Bivens* reflect an intent to make the government's liability coterminous with that of its agents. In other words, Congress intended to incorporate *Bivens* in its entirety, including the immunity doctrines arising thereunder.

While the Court cannot conclude the government's argument to be unreasonable, it is the Court's view that the more logical interpretation is that the Senate Report illustrates the congressional intention of providing a remedy to victims of illegal searches and seizures regardless of the motivation of the offending governmental agent. The Senate repeatedly utilized disjunctive language in describing the circumstances under which liability would attach. By using phrases such as "bad faith *or* without probable cause", and "without warrants *or* with warrants issued without probable cause" Congress seemingly intended to provide for monetary recovery in instances where the offending federal agent would enjoy immunity.[14] The defendant attributes this language to a mistakingly broad reading of *Bivens* by the Senate. While this may or may not be accurate, the relevant inquiry is into what the Senate *thought Bivens* stood for.

The Senate Report outlined the reasons behind the considered need to amend the FTCA as follows:

> For years scholars and commentators have contended that the Federal Government should be liable for the tortious acts of its law enforcement officers when they act in bad faith or without legal justification. However, the Federal Tort Claims Act (28 U.S.C. 2671–2680 the embodiment of sovereign immunity in the United States Code, protects the Federal Government from liability where its agents commit intentional torts such as assault and battery. The injustice of this provision should be manifest—for under the Federal Tort Claims Act a Federal mail truck driver creates direct federal liability if he negligently runs down a citizen on the street but the Federal Government is held harmless if a federal narcotics agent intentionally assaults that same citizen in the course of an illegal "no-knock" raid.

---

tion, those differences do not bear on the issue before the Court. *See* Boger, Gitenstein and Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 U.N.C.L. Rev. 497, 510–517 (1976). For a discussion of other proposals concerning illegal searches and seizures, *see* Geller, Enforcing the Fourth Amendment: The Exclusionary Rule and its Alternatives, 1975 Wash. U.L.J. 621 (1975).

**14.** It is difficult to conjure a situation not involving actual malice where an agent acting under a warrant later found to have been improvidently issued could be found liable for monetary damages in an action under 42 U.S.C. § 1983 or under *Bivens*. It must be pointed out, however, that it is not clear whether Congress was using the term "probable cause" in the constitutional sense, or in the context of immunity. *See* note 6, *supra*.

1974 U.S.Code Cong. & Ad.News at p. 2791 (1974). The foregoing passage is revealing in two respects. First, it once again states the need to impose liability against the government in terms of "bad faith or without legal justification." Secondly, the Senate compares the victim of an illegal search to the victim of an automobile accident—the latter being entitled to compensation regardless of the good faith of the government's driver. These statements reflect a concern with providing a remedy. The remedial orientation of the legislation is made explicit in the closing sentence of the Report which states: "The Committee urges speedy adoption of this measure as a minimal first step in providing a remedy against the Federal Government for innocent victims of Federal law enforcement abuses." An innocent victim is no less in need of a remedy where the injurious conduct, though illegal, is motivated by a reasonable good faith belief in its legality.

There is more direct support for the Court's conclusion that Congress did not intend to permit the United States, as one commentator put it, "to escape liability under the new statute by retreating behind various defenses that had been created under Bivens or Section 1983." Boger, Gitenstein and Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 U.N.C. L.Rev. 497, 515 (1976). The specific issue before the Court had been raised by the authors of the legislation and discussed in a memorandum explaining the proposed amendment. The Senate memorandum succinctly states:

"It is not the intention of this amendment to allow any other defenses [besides those in section 2680(h)] that may be available to individual defendants by state or federal law, custom, or practice to be asserted [by] the government. Congress does not oppose, however, the assertion of defenses of good faith and reasonable belief in the validity of the search and arrest on behalf of individual government defendants, so long as it is understood that the government's liability is not coterminous with that of the individual defendants."

Senate Comm. on Gov't Operations, Memorandum No-Knock Legislation, August 28, 1973, at 5.[15] This memorandum, the views of the amendment's author and the remedial orientation of the Senate Report all lead to the conclusion that the immunity available to an individual agent in a Bivens-type action is not a defense available to the United States to a claim brought under the FTCA.

The congressional decision to remove the shield of official immunity from the government is founded on solid policy considerations. The doctrine of sovereign immunity curiously [16] impregnated American jurisprudence at an early age. See, e. g., Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 411–412, 5 L.Ed. 257 (1821). This doctrine precluded an aggrieved citizen from moving directly against the government to redress injuries suffered at the hands of government officials. In order to provide some relief to the victim of governmental illegalities, the Supreme Court fashioned a concept which has been described as "purest fiction." [17] In Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court ruled that "when a state official acts under state law in a manner violative of the Federal Constitution, he 'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his

15. The Court, regretfully, has been unable to secure an exact copy of this memorandum. The portion quoted herein is found in Boger, Gitenstein and Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 U.N.C. L.Rev. 497, 515 (1976).

16. "Just how an immunity which had its roots in feudalism and in a political philosophy associated with the divine right of kings was transplanted to the new republic in America remains something of a mystery." F. James and F. Harper, The Law of Torts, § 29.2, p. 1609 (1956). For a thorough discussion of the topic, see Jaffe, Suits Against Governments and Officers; Sovereign Immunity, 77 Harv.L.Rev. 1 (1963); Borchard, Government Liability in Tort, 34 Yale L.J. 1, 129, 229 (1924–1925).

17. C. Wright, Law of Federal Courts § 48, p. 209 (3d ed. 1976).

official or representative character and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'" *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974) quoting *Ex Parte Young*, *supra*, 209 U.S. at 159–160, 28 S.Ct. 441. The fictional basis of *Ex Parte Young* also limits the relief that can be granted. Monetary recovery must come from the pocket of the individual officer and not the sovereign. *Edelman v. Jordon*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *See generally* C. Wright, Law of Federal Courts, § 48 (3d ed. 1976).

The possibility of being subjected to personal liability for money damages as a result of the performance of official duties necessitated the creation of a doctrine which would provide some degree of protection to the well-meaning public servant. The resulting doctrine of official immunity is premised upon

two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Scheuer v. Rhodes, supra*, 416 U.S. at 240, 94 S.Ct. at 1688. (footnote omitted). *Accord, Wood v. Strickland*, 420 U.S. 308, 319, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Rowley v. McMillan*, 502 F.2d 1326, 1332 (4th Cir. 1974). *Cf. Barr v. Matteo*, 360 U.S. 564, 571, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

The need to provide a remedy to the victim of governmental illegality thus comes in conflict with the considerations giving rise to the doctrine of official immu-

nity. As Mr. Justice Harlan pointedly observed, there are

"two considerations of high importance which now and again come into sharp conflict—on the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities."

*Barr v. Matteo, supra*, 360 U.S. at 564–565, 79 S.Ct. at 1336. The doctrine of official immunity represents the judicial resolution of those competing interests. Law enforcement agents do not enjoy an absolute immunity from suit despite the discretionary nature of their duties "because of the belief that the benefit to society derived from the protection of personal liberties outweighs the detriment of perhaps deterring vigorous police action." *Bivens v. Six Unknown, etc., Agents, supra*, 456 F.2d at 1346.

The injustices occasioned by the doctrine of sovereign immunity gave rise to *Ex Parte Young* and the imposition on government officials of personal liability for monetary damages. The fear that this personal liability would unduly inhibit public servants from executing their official responsibilities gave rise to the doctrine of official immunity.[18] In the context of law enforcement, this immunity is articulated in terms of a reasonable good faith belief in the legality of the conduct. Thus, "[t]he concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity." *Scheuer v. Rhodes, supra*, 416 U.S. at 239, 94 S.Ct. at 1688. Where, as is the case with the FTCA, the sovereign has waived its immunity, the policy considerations which justify immu-

---

18. This is not to say that the law in this area originated with *Ex Parte Young, supra. See Scheuer v. Rhodes, supra*, 416 U.S. at 239 n. 4, 94 S.Ct. 1683. The development of the public

servants' defenses to monetary liability, however, has escalated with the increase in actions brought against government officials.

**152**

nizing individual law enforcement officers are no longer applicable. *See* 2 F. Harper and F. James, The Law of Torts § 29.14 at pp. 1656–1657 (1956).

This has been recognized by other courts as well. The United States sought to raise the defense of immunity in an action brought under the negligence provisions of the FTCA by a person injured in the course of an FBI agent's efforts to foil an attempted act of air piracy. The district court ruled that the United States was not entitled to assert the immunity defenses of its agents. *Downs v. United States*, 382 F.Supp. 713, 749–751 (M.D.Tenn.1974). In reversing the trial court on other grounds, the Court of Appeals stated "[t]he prospect of governmental liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law. The need for compensation to citizens injured by the torts of government employees outweigh whatever slight effect vicarious liability might have on law enforcement efforts." *Downs v. United States*, 522 F.2d 990, 998 (6th Cir. 1975).

To allow the government to benefit from a doctrine born of sovereign immunity would pervert the clear congressional directive to eliminate sovereign immunity from actions of this nature. As noted by the author of the 1974 amendment to the FTCA, Senator Percy, the effectiveness of a *Bivens*-type remedy is "severely limited" by the doctrine of official immunity. S.Rep. No. 93–469, 93d Cong., 1st Sess. 36. The promise of an effective remedy contained in the 1974 amendment to the FTCA would be largely illusory if the government could assert the immunity defense of its agents. *Cf. Downs v. United States, supra*, 382 F.Supp. at 750.

Concluding therefore that (1) the forcible nighttime entry into the plaintiff's apartment was in violation of her rights secured to her by the Fourth Amendment to the Constitution of the United States; and (2) the United States is not entitled, as a matter of law, to assert the immunity defense available to the individual defendants in an action brought under the Federal Tort Claims Act, the plaintiff is entitled to judgment against the United States on the issue of liability.

An appropriate order will follow.